27 F.3d 1432
 Thane Carl CHEW, Plaintiff-Appellant,
v.
Daryl GATES, individually and as Chief of the Los Angeles
Police Department; City of Los Angeles, a Municipal
Corporation and Public Entity of the State of California;
and Daniel Bunch; Donald Yarnall; Mark Mooring; Patrick
McKinley; and Does 1 through 10, 14, 16 through 20,
inclusive, each individually and as a Los Angeles Police
Officer, Defendants-Appellees.
 No. 91-55718.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 18, 1992.
Decided June 27, 1994.
 
 George V. Denny, III, Los Angeles, CA, and Ralph Leardo, Law Offices of Nancy Ann Fellom, San Francisco, CA, (argued) for plaintiff-appellant.
 Richard M. Helgeson, Asst. City Atty., Los Angeles, CA, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: NORRIS, REINHARDT, and TROTT, Circuit Judges.
 Opinion by Judge REINHARDT; Partial Concurrences and Partial Dissents by Judges NORRIS and TROTT.
 REINHARDT, Circuit Judge:
 
 
 1
 On appeal, Thane Carl Chew seeks the right to pursue his claims for damages resulting from dog bites inflicted on him by a police dog the Los Angeles Police Department uses to capture suspected criminals. Chew brought his action in federal district court pursuant to 42 U.S.C. section 1983. He sued the City of Los Angeles, Police Chief Daryl Gates, and various other members of the police department for violations of his Fourth and Fourteenth Amendment rights. The district court granted summary judgment to all of the defendants except Officer Daniel Bunch. When Bunch's case went to trial, Chew introduced evidence that the officer both turned the police dog loose on him and assaulted him directly. The jury returned a general verdict in the amount of $13,000 against Bunch. This appeal involves only the district court's grant of summary judgment in favor of the other defendants, including the city. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 
 2
 Although there are a number of important issues raised by this case, the two most fundamental are whether the Los Angeles Police Department's policy governing the use of dogs to seize fleeing or hiding suspects is unconstitutional and whether, if so, the officers who are responsible for promulgating that policy enjoy qualified immunity. The latter question, while important, is more of theoretical than practical import in this case because if the policy is unconstitutional the city will be liable for whatever damages result in any event.
 
 
 3
 With respect to the first question, a majority concludes that the district court erred in holding the police department's policy governing the use of dogs constitutional. We do so for somewhat different reasons. Judge Norris prefers to concentrate on the issue of whether the force involved--the use of police dogs to seize and bite people--is deadly, while I would approach the issue more broadly: by examining the question whether the force is excessive--deadly or not. Nevertheless, our conclusions are similar and both issues must be considered by the factfinder upon remand. Accordingly, we reverse the district court's judgment in favor of the city. Because the matter is here on summary judgment, we do not now hold the city's policy unconstitutional but merely remand for a trial by jury of the substantial Fourth Amendment issues that exist.
 
 
 4
 With respect to the question of qualified immunity, a different majority, Judge Trott and the author, agree that the individual policymakers may not be held liable. We conclude that the law with respect to the use of police dogs to seize and bite concealed suspects was not sufficiently established that a reasonable officer would have known that the Los Angeles Police Department's policy was unconstitutional.
 
 I. Facts and Proceedings
 
 5
 At about 2 p.m. on September 4, 1988, an officer of the Los Angeles Police Department stopped plaintiff Thane Carl Chew for a traffic violation in a part of the City of Los Angeles known as Pacoima. Chew subsequently fled from the officer on foot and hid in a scrapyard. The officer had not searched him for weapons. Upon discovering that there were three outstanding warrants for his arrest, the officer radioed for assistance. A police perimeter was set up around the scrapyard, and a helicopter and canine units were called in to search for Chew.
 
 
 6
 Officer Bunch and his charge, police dog Volker, were among those dispatched to assist in the search of the scrapyard. Bunch unleashed Volker and, approximately two hours after Chew had fled to the yard, Volker found him crouching between two metal bins. According to Chew, as soon as he became aware of Volker's presence, he attempted to surrender and yelled to the police to call off the dog. Both sides agree that at this point Officer Bunch was not within sight of Volker. The parties further agree that Officer Bunch did not immediately accede to Chew's request, that Volker bit Chew several times and then seized him, and that Chew sustained severe lacerations to his left side and left forearm. Chew asserts that he did not offer resistance at any time after he spotted the dog and repeatedly begged the officers to restrain his dog, but that Bunch instead ordered Volker to attack. Bunch, on the other hand, vigorously denies that he ordered an attack and maintains that when he first saw Chew, the suspect was hitting the dog with a pipe. Bunch admits kicking at Chew in an attempt to disarm him and to protect Volker, and acknowledges that he may have kicked Chew in the head, face, or body.
 
 
 7
 Chew subsequently brought this action in federal district court, alleging violations of his Fourth and Fourteenth Amendment rights. The first claim of Chew's amended complaint named Officer Bunch, Sergeants Donald Yarnall and Mark Mooring (who trained the L.A.P.D. canines), and Captain Patrick McKinley (who had overall supervisory responsibility for the K-9 unit) as defendants in their individual capacities. In his second claim, Chew sued the City of Los Angeles under Monell v. New York City Dep't of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for injuries allegedly resulting from the city's policy regarding the use of canine force. In the latter claim he also named Police Chief Daryl Gates in both his individual and official capacities as an employee with policymaking authority.[1]
 
 
 8
 The district court granted summary judgment in favor of the individual defendants other than Bunch on the ground of qualified immunity, and in favor of the City of Los Angeles on the ground that Chew had failed to demonstrate that a city policy unlawfully caused his injuries. The case proceeded to trial against Officer Bunch, and the jury rendered a $13,000 general verdict in Chew's favor. Pursuant to California Government Code Secs. 815.2 and 825, the city has paid the judgment and attendant fees and costs on Bunch's behalf.
 
 II. Article III Jurisdiction
 
 9
 The city and the other remaining defendants contend that Chew has been fully compensated by the $13,000 verdict against Bunch, and that in view of the city's decision to assume "full responsibility" for all damages, no real case or controversy with Chew remains. According to the defendants, allowing Chew to pursue the instant action any further would result in an "advisory opinion" that would at most identify different causal agents for an injury that has already been fully redressed. Therefore, the defendants argue, we lack Article III jurisdiction over the present appeal.
 
 
 10
 Defendants did not raise this contention in the district court, perhaps in part because the judgment against Bunch was obtained after the court granted summary judgment for the remaining defendants. In any event, there was no reason for either party to have raised the question below. The issue relates solely to the effect of an unchallenged judgment obtained against one defendant upon the plaintiff's right to appeal judgments in favor of other defendants. As such, it may be raised for the first time on appeal.[2]
 
 
 11
 Under Article III, federal appellate courts may adjudicate only actual, ongoing controversies between the litigants. Deakins v. Monaghan, 484 U.S. 193, 199, 108 S.Ct. 523, 527, 98 L.Ed.2d 529 (1988). If there is no longer a live dispute between the parties or a possibility that a plaintiff can obtain further relief, a case is moot. See Sea-land Service, Inc. v. International Longshoremen's & Warehousemen's Union, 939 F.2d 866, 870 (9th Cir.1991) (case is moot if none of the issues within it is viable). Here, the defendants' position appears to be that the city's assumption of Bunch's liability to Chew precludes further litigation of his claims for additional relief, thus rendering the instant appeal moot. See 13A Charles Alan Wright et al., Federal Practice and Procedure, Sec. 3533.2 at 151 (Supp.1993) (noting that mootness and claim preclusion are closely related doctrines).
 
 
 12
 Chew's claims against the defendants are not moot for two reasons. With respect to the first, we must start with the fact, ignored by the defendants, that the three constitutional violations alleged against Officer Bunch are different from the constitutional wrongs that they allegedly committed. Chew asserted that Bunch violated his constitutional rights first by improperly releasing Volker, a dangerous animal trained to bite and maul suspects, next by ordering the dog to attack him after he attempted to surrender, and finally by kicking him in the head and body. Chew charges that the other defendants violated his rights by adopting and implementing a policy of training and using police dogs in an unreasonable manner. The allegations against the remaining defendants, if true, constitute wrongs distinct from any committed by Bunch, regardless of the fact that the dog bites are alleged to have resulted from the actions of all the defendants.
 
 
 13
 Notwithstanding Chew's articulation of separate constitutional wrongs against the remaining defendants, those claims would be moot unless Chew could obtain some type of relief for them. See Sea-land, 939 F.2d at 870. The defendants assert that Chew is barred from seeking damages against them because the injury Chew incurred was fully compensated by the jury verdict and the subsequent payment of damages by the city on Bunch's behalf. They are wrong. For the reasons set forth in the next section, Chew can recover actual damages from the remaining defendants. Moreover, it is well settled that a plaintiff may recover nominal damages for a "separate and distinct [constitutional] wrong" whether or not he is permitted to recover actual or punitive damages for that wrong. Larez v. City of Los Angeles, 946 F.2d 630, 640 (9th Cir.1991). Thus, Chew would in any event be free to pursue his claims against the remaining defendants for nominal damages.
 
 
 14
 Chew's claims are not moot, and we have Article III jurisdiction over this appeal.
 
 III. Issue Preclusion
 
 15
 The defendants' next contention, alluded to briefly above, is that the jury verdict and its subsequent satisfaction by the city serves to bar Chew from obtaining any actual damages against them. Whether they are correct depends upon the basis for the verdict. If it was based wholly or partly on the injuries inflicted by Volker after his release by the officer, the $13,000 damage award would necessarily represent a factual determination of the damages that Chew suffered on account of the dog bites. In that case both Chew and the defendants would be collaterally estopped from relitigating the issue of the dog bite damages. See RESTATEMENT (SECOND) OF JUDGMENTS Sec. 50(2) and comment d (1982); FSLIC v. Reeves, 816 F.2d 130, 135 (4th Cir.1987); Gill & Duffus Services, Inc. v. A.M. Nural Islam, 675 F.2d 404, 407 (D.C.Cir.1982). Moreover, in that event, because the judgment obtained as compensation for the dog bite injuries would already have been paid in full, the so-called one-satisfaction rule would preclude Chew from seeking a further monetary award from the remaining defendants for those injuries. See id.
 
 
 16
 The initial question, therefore, is whether the jury's verdict against Bunch was based, even in part, on the dog-bite injuries. The party asserting preclusion has the burden of showing that the issue as to which estoppel is claimed was actually adjudicated in a prior proceeding. See Hernandez v. City of Los Angeles, 624 F.2d 935, 937 (9th Cir.1980). Necessary inferences from the judgment, pleadings, and evidence will be given preclusive effect, but if there is doubt as to the scope of the prior judgment, collateral estoppel will not be applied. See Davis & Cox v. Summa Corp., 751 F.2d 1507, 1518 (9th Cir.1985) citing Harris v. Jacobs, 621 F.2d 341, 343 (9th Cir.1980). Where the prior judgment was based on a general verdict, the inquiry is whether rational jurors must necessarily have determined the issue as to which estoppel is sought. See id. at 1519; see also United States v. Seley, 957 F.2d 717, 721, 722 n. 3 (9th Cir.1992) (applying collateral estoppel where reasonable jurors could have reached only one of two conceivable results).
 
 
 17
 While, on the basis of the record before us, it appears that the jury may have compensated Chew for Volker's bites, we cannot say with any assurance that it did so. We simply have no way of knowing. It would not have been irrational or even unreasonable for the jury to have compensated Chew for Bunch's kicks and not for the dog's bites, or, to put it in more legalistic terms, for Bunch's direct rather than indirect assault. We can only speculate as to which injury or injuries underlay the verdict, and speculation will not support the application of collateral estoppel. See Davis, 751 F.2d at 1519; see also Board of County Sup'rs v. Scottish & York Insurance, 763 F.2d 176 (4th Cir.1985) ("We cannot distill special findings from a general verdict and to do so would intrude on the independent role of a jury as much as would a court's unilateral amendment of its verdict."). Consequently, we must presume, for collateral estoppel purposes, that the verdict compensated Chew for Bunch's kicks and not for Volker's bites.
 
 
 18
 This determination does not, however, conclude the issue preclusion inquiry. Specifically, Chew is left with the challenge of demonstrating that it is legally possible to assume that the jury found Officer Bunch not liable for the dog bites and at the same time to hold the remaining defendants liable for them. That challenge is easily met. A judgment that Bunch is not liable for releasing Volker, given all of the circumstances, would not preclude a judgment that by implementing a policy of training and using the police dogs to attack unarmed, non-resisting suspects, including Chew, the remaining defendants caused a violation of Chew's constitutional rights. Supervisorial liability may be imposed under section 1983 notwithstanding the exoneration of the officer whose actions are the immediate or precipitating cause of the constitutional injury. See Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir.1992) (noting that "the police chief and city might be held liable for improper training or improper procedure even if [defendant police officer] is exonerated").
 
 
 19
 The jury in this case could have concluded that it was reasonable for Bunch to release Volker--even knowing what he was likely to do to Chew--given the fact that the procedures adopted by the city left him with no other means of apprehending the suspect that involved less risk of bodily injury to himself or the suspect. Because it is not clear that such a conclusion would be contrary to law or that rational jurors could not have reached that result, the doctrine of collateral estoppel does not preclude further litigation of Chew's claims against the remaining defendants for actual damages on the basis an unconstitutional policy or the failure to supervise or train properly.
 
 
 20
 There is an additional reason why the verdict against Bunch does not bar Chew from seeking a remand for a further trial--a reason that applies only to the City of Los Angeles. The jury might have excused Bunch from liability for the dog bites on the ground of qualified immunity. The district court instructed the jury that a public official is immune from liability "as long as his conduct does not violate clearly established constitutional or statutory requirements of which a reasonable person would have known." The city is not entitled to a similar defense. See, e.g., Brandon v. Holt, 469 U.S. 464, 473, 105 S.Ct. 873, 878-79, 83 L.Ed.2d 878 (1985). Because there is a possibility that the jury accepted Bunch's defense of qualified immunity and declined to award damages for the dog bites on that ground, the issue of the city's liability has not been actually and necessarily decided. See Barber v. City of Salem, Ohio, 953 F.2d 232, 237-38 & n. 1 (6th Cir.1992) (explaining that verdict for defendant police officers entitled to qualified immunity did not preclude recovery against city).
 
 
 21
 For these reasons, the satisfaction of the judgment against Bunch does not bar Chew from pursuing his claims for actual damages for his dog-bite injuries against the remaining defendants. Moreover, because it is not clear that Chew has received any compensation at all for Volker's bites, the $13,000 judgment may not be subtracted from any future recovery he obtains for those injuries. Thus, whether they are labelled as arguments relying on mootness, claim preclusion, issue preclusion or the one satisfaction rule, the jurisdictional or procedural obstacles urged by the defendants present no barrier to any further proceedings in this case. We must therefore turn to the merits of the district court's grant of summary judgment in favor of all defendants other than Bunch.
 
 IV. Merits
 
 22
 The district court granted summary judgment in favor of the remaining defendants on the ground that the use of Volker for the purpose of apprehending Chew was an objectively reasonable act. Chew v. Gates, 744 F.Supp. 952, 956 (C.D.Cal.1990).[3] We must determine, viewing the evidence in the light most favorable to Chew, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-1340 (9th Cir.1989).
 
 A. The City of Los Angeles
 
 23
 In order to succeed on his section 1983 claim against the city, Chew must demonstrate first that his seizure by Volker was unconstitutional and second that the city was responsible for that constitutional wrong. Monell, 436 U.S. at 690-94, 98 S.Ct. at 2035-38. Chew advances two distinct theories of Monell liability. First, he contends that Officer Bunch violated his Fourth Amendment right not to be subjected to excessive force by unreasonably releasing Volker and that Bunch's action was caused by a city policy, custom, or usage. Second, he argues that, regardless of the reasonableness of Officer Bunch's action in releasing the dog (given the alternatives then available to him), the city's policy of training police dogs such as Volker to apprehend unarmed and non-resistant suspects by biting, mauling, and seizing them was itself unreasonable and unconstitutional.
 
 
 24
 The district court held that the city was not liable under either theory for the bites inflicted by Volker because "the manner in which the police dog was used to apprehend Chew did not, under the circumstances, infringe on his constitutional rights." 744 F.Supp. at 956.[4] Initially, we must determine whether the district court correctly concluded that Chew suffered no constitutional injury. Under Chew's first theory of municipal liability, whether a constitutional wrong was committed depends upon an assessment of the objective facts and circumstances bearing on the reasonableness of Officer Bunch's decision to release Volker. The existence of a constitutional injury under Chew's second theory is not dependent on the lawfulness of Officer Bunch's conduct, but instead turns on the reasonableness of the city's general policy of training dogs to bite and seize all suspects.
 
 
 25
 For the reasons that follow, the district judge erred in finding as a matter of law that Officer's Bunch's decision to release Volker was reasonable. While the district court never reached them, there are also genuine issues of material fact with respect to whether Bunch's decision was made pursuant to city policy. Thus we are required to remand for trial on Chew's first theory of municipal liability. It is therefore unnecessary to determine whether the record requires reversal on Chew's alternative Monell theory as well. Specifically, it is not necessary to decide here whether the city's policy of training its police dogs to bite and seize is unconstitutional. However, on remand, Chew is entitled to pursue that question fully, as well as any other theory of municipal liability as to which he can obtain probative evidence.
 
 1. Bunch's Decision to Release Volker
 
 26
 With respect to Chew's first theory--that a triable issue of fact exists as to whether Bunch's release of Volker constituted the use of unreasonable force--we start from the fundamental premise that the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures. See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). There is, of course, no mechanical test for determining whether a particular application of force was unreasonable; the reasonableness of a seizure must instead be assessed by carefully considering the objective facts and circumstances that confronted the arresting officer or officers. See id. at 396, 109 S.Ct. at 1871-72.
 
 
 27
 In determining reasonableness, "the nature and quality of the intrusion on the individual's Fourth Amendment interests" must be balanced against the "countervailing government interests at stake." Id. (internal quotations omitted). To assess the gravity of a particular intrusion on Fourth Amendment rights, the factfinder must evaluate the type and amount of force inflicted. In weighing the governmental interests involved the following should be taken into account: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. Id.[5] The relevant inquiry is, moreover, an objective one--good intentions will not redeem an otherwise unreasonable use of force, nor will evil intentions transform an objectively reasonable use of force into a constitutional violation. Id. at 397, 109 S.Ct. at 1872. Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury. See Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); White by White v. Pierce County, 797 F.2d 812, 816 (9th Cir.1986).
 
 
 28
 Here, the district court itself applied the "objective reasonableness" test. The court reasoned that all three of the factors articulated in Graham v. Connor supported the decision to use canine force to arrest Chew, and on that basis held that Bunch's release of Volker was reasonable as a matter of law. When all disputes of fact are resolved in Chew's favor, as they must be for purposes of summary judgment, it is apparent that application of the Graham factors would not have required a rational jury to decide that using Volker to apprehend him was reasonable. Moreover, the district court's decision to take the excessive force question away from the jury conflicts with circuit law.
 
 
 29
 First, it is necessary to assess the quantum of force used to arrest Chew. The three factors articulated in Graham, and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure--an analysis the district court never explicitly undertook.[6]
 
 
 30
 By all accounts, the force used to arrest Chew was severe. Chew was apprehended by a German Shepherd taught to seize suspects by biting hard and holding. According to the defendants, Volker had to bite the suspect three times before he could achieve an effective hold. Chew adds that, gripping his left side and then his left arm with his jaws, the dog dragged him between four and ten feet from his hiding place. Chew asserts that his arm was nearly severed. Officer Bunch acknowledged that the injuries to Chew's side and arm were "pretty severe," and that "[t]here was some serious lacerations."[7]
 
 
 31
 Bunch had good reason to expect that Chew might sustain exactly this type of mauling when he released Volker. All of the K-9 officers testified that the police dogs were trained to bite suspects unless a countermanding order was given by the handler. Here, because Volker was sent to locate a concealed suspect, the dog would almost necessarily be out of sight of its handler, and hence beyond the reach of a countermanding order, if and when he came upon Chew.[8] Further, the deposition of Sergeant Mooring established that if a suspect attempted to elude the dog's bite instead of passively allowing the animal to maintain its hold, the dog would repeatedly bite the suspect in an effort to obtain a sustained grip with its jaws. Chief Gates' deposition disclosed that he was "very much" aware that such bites could be fatal, and Officer Bunch echoed this awareness. Cf. Robinette v. Barnes, 854 F.2d 909 (6th Cir.1988) (burglary suspect died of wounds inflicted when a police dog seized him by the throat).
 
 
 32
 Second, it is necessary to turn to the district court's application of the Graham criteria, beginning with the most important single element of the three specified factors: whether the suspect poses an immediate threat to the safety of the officers or others. The record does not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone's safety. Cf. Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985) (holding that fourth amendment permits use of deadly force to apprehend a fleeing felon where there is "probable cause to believe the suspect poses a threat of serious physical harm"). Chew was initially stopped for a traffic violation. Before he fled, he was asked for his driver's license, and produced it. He also retrieved cigarettes and a lighter from his car, lit a cigarette, and engaged in a certain amount of conversation with the officer before his flight. Apparently, nothing about Chew's appearance or demeanor gave the officer reason to believe he should search the suspect. It appears from the record that after fleeing Chew hid in the scrapyard for an hour and a half before Bunch released Volker in an effort to capture him. The defendants do not suggest that Chew engaged in any threatening behavior during this time, or that he did anything other than hide quietly. In light of these facts, a rational jury could easily find that Chew posed no immediate safety threat to anyone.
 
 
 33
 The existence of a factual question as to whether Chew posed a safety threat would in itself be enough to preclude summary judgment in favor of the defendants if we were to determine that seizing a suspect by means of a German Shepherd trained to bite hard then hold constitutes deadly force, see Garner, 471 U.S. at 11, 105 S.Ct. at 1701 (holding that fourth amendment does not permit use of deadly force to apprehend suspect who poses no immediate threat to the officer and no threat to others). Indeed, Judge Norris's separate opinion rests on the conclusion that Chew has presented a genuine issue of material fact with respect to whether the Los Angeles Police Department's use of dogs constitutes "deadly force." He may well be right. However, it is not necessary to decide here whether the record sufficiently raises that question, for the grant of summary judgment must be reversed whether or not Chew adduced adequate evidence tending to show that the considerable force used here was "deadly." Of course, as stated earlier, Chew is free on remand to pursue the deadly force issue fully.
 
 
 34
 The other two specified Graham factors cut in favor of the defendants, but only slightly. With respect to whether Chew was "actively resisting arrest," it is undisputed that he fled and then hid from the police. He did not, however, resist arrest to the point of offering any physical resistance to the arresting officers, nor, at the time the officers released the dogs, did they have any particular reason to believe that he would do so. With respect to whether he was attempting to evade arrest by flight when Volker was released, the answer is yes and no. In a general sense he was, but in more precise terms his flight had terminated, at least temporarily, in the scrapyard. Still, a slight edge goes to the government on this score.
 
 
 35
 Turning to the severity of the crime for which Chew was arrested, although he was initially stopped for a traffic violation, the traffic officer later discovered the existence of three outstanding felony warrants for his arrest. The district court correctly pointed out that outstanding felony warrants are not to be taken lightly. However, in view of the fact that the record does not reveal the type of felony for which Chew was wanted, the existence of the warrants is of limited significance. A wide variety of crimes, many of them nonviolent, are classified as felonies. The Supreme Court has observed that "while in earlier times the gulf between felonies and the minor offences [sic] was broad and deep, today, the distinction is minor and often arbitrary." Garner, 471 U.S. at 14, 105 S.Ct. at 1703 (internal quotation omitted). It added: "the assumption that a felon is more dangerous than a misdemeanant [is] untenable." Id. The existence of three warrants for undetermined crimes--for which Chew had not been tried or convicted--is thus not strong justification for the use of dangerous force.[9] The significance of the warrants is further diminished by the facts that Chew was completely surrounded by the police, and that the prospects for his imminent capture were far greater than are those of the many fleeing suspects who are fleeter than the police officers chasing them.
 
 
 36
 This was not an occasion on which the police were forced to make "split-second judgments" in circumstances that were "rapidly evolving." Graham, 490 U.S. at 397, 109 S.Ct. at 1872. Chew was trapped in the scrapyard for two uneventful hours before Volker bit and mauled him. There was time for deliberation and consultation with superiors. There was even time for the police to summon a helicopter to the scene, an airborne vehicle which apparently aided the dogs in their search. What other tactics if any were available--given the absence of urgency--is, again, a question to be explored upon remand.
 
 
 37
 Under all of the circumstances, the question of the reasonableness of the decision to use the force involved, whether or not "deadly," to seize Chew must be submitted to a jury. When the record is viewed in the light most favorable to the nonmoving party, the Graham factors do not all support either side. However, the most important factor--the absence of an immediate safety threat--cuts strongly in Chew's favor, while the other two tilt only slightly in favor of the defendants. Such a record does not render reasonable as a matter of law the considered judgment to unleash a German Shepherd trained to seize suspects by "biting hard and holding," by mauling and sometimes seriously injuring them. Moreover, while no circuit precedent is precisely on point, Reed v. Hoy, 909 F.2d 324 (9th Cir.1989), cert. denied, 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1053 (1991) appears to establish the existence of a jury issue a fortiori.[10] Reed demonstrates that whether a particular use of force was reasonable is rarely determinable as a matter of law. That decision controls the outcome of the excessive force question in this case. If Deputy Hoy's split-second decision to use deadly force in response to an impending threat to his own safety was not reasonable as a matter of law, we cannot say that in this case the use of force that at the very least approaches deadly proportions meets that standard. See Garner, 471 U.S. at 11, 105 S.Ct. at 1701 (threat to officer and public must be immediate to justify application of deadly force).
 
 
 38
 In conclusion, the question whether it was reasonable under the Fourth Amendment for Bunch to release Volker was for the jury.[11]2. Municipal Liability
 
 
 39
 Although the district court ended its inquiry with the question whether Chew's constitutional rights were violated by the release of Volker (and the dog's subsequent conduct), we cannot. Because a genuine dispute of material fact exists as to the constitutional violation, we must consider whether the district court's grant of summary judgment for the city may be affirmed on the ground that Chew's injury did not result from the application or enforcement of an official city policy. See Jackson v. Southern California Gas Co., 881 F.2d 638, 643 (9th Cir.1989) (summary judgment may be upheld based upon any ground supported by the record).
 
 
 40
 Under the Monell doctrine, Chew may recover from the city if his injury was inflicted pursuant to city policy, regulation, custom, or usage. See Monell v. Dept. of Soc. Serv. of City of N.Y., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978). City policy "need only cause [the] constitutional violation; it need not be unconstitutional per se." Jackson v. Gates, 975 F.2d 648, 654 (9th Cir.1992); see also Collins v. City of Harker Heights, Tex., --- U.S. ----, ----, 112 S.Ct. 1061, 1067, 117 L.Ed.2d 261 (1992).[12] City policy "causes" an injury where it is "the moving force" behind the constitutional violation, Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38, or where "the city itself is the wrongdoer." Collins, --- U.S. at ----, 112 S.Ct. at 1067.
 
 
 41
 There is little doubt that a trier of fact could find that Chew's injury was caused by city policy. In the district court, the city conceded, for purposes of summary judgment, the truth of Chew's contention that departmental policy authorized seizure of all concealed suspects--resistant or nonresistant, armed or unarmed, violent or nonviolent--by dogs trained to bite hard and hold.[13] Construing city policy as the appellee concedes we must, it doubtless could be found to be the "moving force" behind Chew's injury. Bunch released Volker because his superiors instructed him that he was authorized to do so under the circumstances of Chew's case. The instructions were based on what we assume to be city policy. Accordingly, we must reverse the district court's grant of summary judgment in favor of the City of Los Angeles.
 
 
 42
 In its brief on appeal, the city ignores the concessions it made in the district court and attempts to argue that even if the department's policy was to use dogs to apprehend concealed suspects by biting and mauling them, this policy was attributable only to the officers responsible for training the canine units, and not to the police chief or the police commission--the two entities vested with the authority to make municipal policy. The city is bound by the concession it made in the district court. However, even if it were not, summary judgment for the city would be inappropriate on this record.
 
 
 43
 A city cannot escape liability for the consequences of established and ongoing departmental policy regarding the use of force simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers. Los Angeles could not, for example, distance itself from policy regarding the use of firearms by de facto delegating the formulation of firearms policy to the commander of the police academy. So too here: if the city in fact permitted departmental policy regarding the use of canine force to be designed and implemented at lower levels of the department, a jury could, and should, nevertheless find that the policy constituted an established municipal "custom or usage" regarding the use of police dogs for which the city is responsible. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).
 
 
 44
 Further, even if we were to accept the city's argument that no jury could find that departmental canine policy was officially sanctioned, municipal liability could be found under the "deliberate indifference" formulation of Monell liability. See City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In order to accept the city's contention that departmental canine policy was not officially sanctioned, we would have to find that the city itself had no policy regarding the proper use of canine force, or, at best, a policy of vesting complete discretion regarding the use of the canines in the dogs' handlers. The record contains evidence that the dogs bit suspects in over 40% of the instances in which they were used. Where the city equips its police officers with potentially dangerous animals, and evidence is adduced that those animals inflict injury in a significant percentage of the cases in which they are used, a failure to adopt a departmental policy governing their use, or to implement rules or regulations regarding the constitutional limits of that use, evidences a "deliberate indifference" to constitutional rights. Under such circumstances, a jury could, and should, find that Chew's injury was caused by the city's failure to engage in any oversight whatsoever of an important departmental practice involving the use of force.
 
 
 45
 Finally, as noted earlier, on remand Chew is not limited to pursuing any single theory underlying our decision that summary judgment was improper. The district court's grant of summary judgment for the city was based on the conclusion that Officer Bunch's decision to release Volker was reasonable. However, municipal liability need not be predicated on an "unreasonable" action on Officer Bunch's part. A jury could conceivably decide, for example, that although the officer's on-the-scene decision to use canine force was reasonable under the circumstances, the city was nevertheless at fault for providing its officers with dogs trained to bite and seize all concealed suspects regardless of their efforts to surrender. If the plaintiff could prove at trial that training in less dangerous means of detection and apprehension was both feasible and effective from a law enforcement standpoint (and the city's recent adoption of a "find and bark" policy suggests that it may well have been[14]), then the city's failure so to train its dogs may well have constituted an unreasonable municipal action regarding the use of force.
 
 
 46
 Judge Norris has written separately in order to discuss fully the critical issue of whether the city's policy regarding the use of police dogs violates the Garner deadly force rules. The matters set forth in his opinion are certainly appropriate for Chew to pursue and develop by means of a proper evidentiary showing on remand. Essentially, Judge Norris suggests that using police dogs trained to "bite and seize" suspects to locate and hold concealed individuals who are not reasonably believed to be dangerous may violate the Fourth Amendment. He may well be correct. It is also possible, however, that siccing dogs trained in such a manner on any suspects would be found to violate that Amendment, if the method of training is found to be unreasonable in light of available alternatives. Both of these issues are deserving of full exploration upon remand.
 
 B. The Individual Defendants
 1. Prima Facie Liability
 
 47
 Chew sues Gates, Mooring, McKinley, and Yarnall in their individual capacities.[15] Although these defendants did not personally participate in the infliction of Chew's injury, they may be held individually liable if they "cause[d]" him to be subjected to a constitutional deprivation. Bergquist v. County of Cochise, 806 F.2d 1364, 1369 (9th Cir.1986), disapproved on other grounds, Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). The existence of the requisite causal connection is implicit in the earlier conclusion that liability on the part of both Officer Bunch and the city could flow from Bunch's decision to use canine force against Chew. The remaining individual defendants all served as links connecting the officer and the city in this respect. Mooring and Yarnall designed and implemented departmental policy governing the use of canine force, McKinley had overall supervisory responsibility for the K-9 unit, and Chief Gates was not only responsible for the operations of the department as a whole, but was familiar with the canine incidents that occurred and regularly reported to the police commission on the performance of the K-9 unit. Viewed in the light most favorable to Chew, this evidence presents a genuine issue of material fact as to whether each of these defendants authorized, approved, or acquiesced in the canine force policy--a policy which may following trial be determined to constitute a cause of Chew's injuries. See Los Angeles Protective League v. Gates, 907 F.2d 879, 894 (9th Cir.1990); McRorie v. Shimoda, 795 F.2d 780, 783-84 (9th Cir.1986), citing Heller v. Bushey, 759 F.2d 1371, 1375 (9th Cir.1985), rev'd and remanded on other grounds sub nom., City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).
 
 
 48
 2. Qualified Immunity*
 
 
 49
 We conclude, however, that the district court's grant of summary judgment in favor of the individual defendants other than Bunch on the ground of qualified immunity was proper. For the purposes of this section, we continue to assume that departmental policy authorized the use against all concealed suspects of dogs trained to search for and apprehend persons by biting and seizing them. 744 F.Supp. at 954. Whether the defendants are entitled to qualified immunity for their actions in formulating or implementing such a policy "turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987) (internal cites and quotation marks omitted). Specific precedent is not required in order to overcome a qualified immunity defense, but the law in question must be sufficiently clear that the unlawfulness of the action would have been apparent to a reasonable official. Id. at 640, 107 S.Ct. at 3039. Here, a reasonable law enforcement official might well have failed to recognize that authorizing or implementing the policy at issue would result in the violation of the constitutional rights of persons seized by the police dogs.
 
 
 50
 When the incident that led to the filing of this lawsuit occurred, the use of police dogs to search for and apprehend fleeing or concealed suspects constituted neither a new nor a unique policy. The practice was long-standing, widespread, and well-known. No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was unlawful. At the time of the incident in question, the only reported case which had considered the constitutionality of such a policy had upheld that practice. See Robinette v. Barnes, 854 F.2d 909 (6th Cir.1988) (holding that use of police dog trained to bite a suspect's arm or other available limb to apprehend a burglary suspect hiding in a darkened building was constitutional). We are certain that Robinette is not consistent with the law of this circuit today, see supra note 10, and seriously doubt whether we would ever have reached a similar result. Nevertheless, at the time of Chew's arrest, Robinette was the only appellate decision in the general area.[16] Because of the then current widespread acceptance of the practice of using police dogs to make arrests, and the absence of any contrary authority, we conclude that at the time of Volker's assault there was no clearly established law prohibiting the use of dogs in the manner permitted by the Los Angeles Police Department's policy.
 
 
 51
 Chew contends that it was apparent from several district court decisions discussing the use of police dogs that the department's canine force policy was unlawful. See Luce v. Hayden, 598 F.Supp. 1101 (D.Me.1984); Soto v. City of Sacramento, 567 F.Supp. 662 (E.D.Cal.1983); Starstead v. City of Superior, 533 F.Supp. 1365 (W.D.Wis.1982). The facts in all of these cases differ dramatically from the circumstances in which the use of dogs was authorized under the L.A.P.D. policy. In Luce, the plaintiff claimed that state troopers "sicced" a dog on him while he was lying prone and handcuffed. Similarly, in Soto, the plaintiff alleged that he had surrendered, was lying on the ground, and had spread his hands pursuant to police instructions when the police released the dog that bit him. Finally, Starstead dealt with a number of completely gratuitous uses of canine force, including the use of biting dogs against handcuffed suspects and against a defendant stopped for a traffic violation. The circumstances in these cases are too far removed from the policy involved here to be of any aid to Chew.
 
 
 52
 Marley v. City of Allentown, 774 F.Supp. 343, 345-46 (E.D.Pa.1991), aff'd mem., 961 F.2d 1567 (3d Cir.1992), does not support Chew's claim, either. Marley was decided after the incident in this case, and it involved an episode which took place after Chew's apprehension. Accordingly, at best the decision is of limited use in determining whether the policy at issue here was clearly unlawful at the time the defendants formulated and implemented it. Marley also involved a very different set of circumstances from this case. The district court in Marley distinguished Robinette on two grounds: (1) that the suspect in Robinette was a suspected felon, while the suspect in Marley was a suspected misdemeanant; and (2) that the suspect in Marley was "either fleeing or stopping," while the suspect in Robinette was hiding. Id. at 345. On both grounds, Chew's case is much closer to Robinette than to Marley.[17]
 
 
 53
 We conclude that as of the time Chew was bitten by Volker the Los Angeles Police Department's longstanding policy regarding the training and use of police dogs did not contravene clearly established law. We recently explained in Mendoza v. Block, 27 F.3d 1357 (9th Cir.1994), that "[w]e do not believe that a more particularized expression of the law is necessary for law enforcement officials using police dogs to understand that under some circumstances the use of such a 'weapon' might become unlawful." Mendoza, 27 F.3d at 1362 (emphasis added). While our statement was quite simple, if not self-evident, and was limited to the proposition that some uses of dogs will in particular instances violate clearly established law, in his dissent Judge Norris transmutes that modest statement into an all-encompassing and pervasive pronouncement governing all uses of force. He claims that Mendoza stands for the proposition that "the law governing all excessive force cases, regardless of the instrument used to apply the force, is 'clearly established.' " Opinion of Judge Norris at 1460 (emphasis in original). Remarkably, he argues that, Mendoza establishes the rule that "the generic principles established in Garner " render the law clearly established in all excessive force cases. Opinion of Judge Norris at 1460. It is difficult to recognize in Judge Norris's description of the case what Mendoza actually says, and we must respectfully decline to read Mendoza as establishing so broad and unprecedented a rule as Judge Norris urges.[18]
 
 
 54
 We read our decision in Mendoza as meaning exactly what it said: it is clearly established that under some circumstances the use of police dogs is unlawful. However, that conclusion clearly does not advance Chew's cause. The Mendoza court gave the following example of the type of conduct that it considered prohibited by clearly established law: "[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control." Id. at 1362. While this statement of the law is indisputable, the policy at issue here is far different from the siccing of dogs on handcuffed arrestees. See supra p. 1447-1448. Here, we must determine whether it was clearly established that it was unlawful to use police dogs to search for and apprehend concealed suspects by biting and seizing them. At the time the individual defendants implemented the Los Angeles Police Department's policy, the answer was, without question, "No."[19] Indeed, the Mendoza opinion itself makes this clear, in a direct and unambiguous manner. In surveying the established law regarding "the appropriate use of police dogs," Mendoza, at 1361, the Mendoza court quoted the following statement from the district court opinion in the instant case: "Neither federal law nor California law clearly prohibits the training and/or use of police dogs to find, seize, and hold suspects, by biting if necessary." Chew v. Gates, 744 F.Supp. 952, 954 (C.D.Calif.1990), quoted in Mendoza, at 1361. Here, we simply reaffirm the statement we endorsed in Mendoza: when the defendants implemented the policy at issue in this case, it was not clearly established either that police dogs constituted deadly force, or that the use of dogs to find, bite, and hold concealed suspects was unreasonable.[20]
 
 
 55
 Although the decision in Robinette bolsters our conclusion that the officers are entitled to qualified immunity here, we rely principally on the fact that the policy employed by the Los Angeles Police Department was a longstanding official policy, which was well-known and similar to the policies employed in many police departments throughout the nation, none of which had been judicially questioned. Pace Judge Norris, we do not "regard Robinette as an automatic guarantee of qualified immunity to officers in ... dog bite cases." Opinion of Judge Norris at 1459. Moreover, we do not mean to suggest by our decision that officers will be entitled to qualified immunity if they authorize the use of a new weapon or tactic which violates constitutional norms, simply because there is no case stating that the specific weapon or tactic involved violates the Constitution. To the contrary, if new weapons or tactics are sufficiently similar in design, purpose, effect, or otherwise to weapons or procedures that have been held unconstitutional, so that a reasonable officer would have known that a court's holding of unconstitutionality would be extended to the new weapon or tactic, then qualified immunity will not apply. Similarly, even if a policy is longstanding and no case has declared it unconstitutional, officers authorizing its continued use will not be entitled to qualified immunity after a case has authoritatively declared unlawful other procedures that are not "meaningfully distinguishable." Wood v. Ostrander, 879 F.2d 583, 592 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). Finally, we do not mean to suggest that all actions taken pursuant to a longstanding policy are necessarily immunized. An officer who unlawfully implements an official policy or ordinance in an egregious manner or in a manner which clearly exceeds the reasonable bounds of the policy is not entitled to qualified immunity, whether or not there is a case on point declaring such actions unconstitutional. In other words, even in the absence of relevant case law, if the manner of implementation of an otherwise constitutional policy is not only unconstitutional but patently so, the officer will be deemed to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Moroever, the existence of an unofficial or unacknowledged policy or practice is not sufficient to immunize an officer from liability. The clandestine nature of such a policy may suffice to put a reasonable officer on notice that it violates established legal norms. Here, we simply do not believe that, given the historical facts and circumstances, the use of police dogs in the manner prescribed in the Los Angeles Police Department's policy is sufficiently similar to other uses of force held to be unconstitutional by the courts to put reasonable law enforcement officials on notice that the department's policy violated the Fourth Amendment; nor do we believe that the individuals here seeking qualified immunity were otherwise put on notice by the nature of the conduct itself.
 
 
 56
 Because at the time of Chew's arrest the Los Angeles Police Department's longstanding, well-known practice of using police dogs to make arrests by biting and seizing was similar to that employed by other police departments across the country, because no court had ever questioned such a practice, and because the practice is "meaningfully distinguishable" from other police conduct previously held unconstitutional, we conclude that the doctrine of qualified immunity is applicable. Accordingly, we affirm the district court's grant of summary judgment to all of the individual appellees, specifically, defendants Gates, McKinley, Mooring, and Yarnall.
 
 
 57
 V. The Dissent from the Reversal of the Judgment in Favor of the City of Los Angeles
 
 
 58
 When public concern rises dramatically over an issue like crime, and politicians in the highest offices throughout the land rush to abandon any pretense of a commitment to fundamental constitutional principles, it is essential that judges keep their cool--that we, at least, remain determined to fulfill our role as the objective, steadfast guardians of individual liberty. First and foremost, it is our obligation to resist all temptations to succumb to hysteria, all inclinations to ignore our responsibilities and simply to join the pack.
 
 
 59
 Regrettably, it is necessary to add here that Judge Trott well knows that the reference to "the pack" is not to "decent people genuinely worried about the world in which they and their children live." Opinion of Judge Trott at 1463. Rather, the term obviously refers to those who in making or enforcing our laws knowingly and hypocritically disregard the Constitution and instead do what is most expedient or serves their own self-interest. Judge Trott's maudlin attempt to portray himself as the defender of "the People" provides a fortuitous if most unfortunate example of that form of conduct.
 
 
 60
 Judges are not correspondents for Newsweek. We do not campaign for office in large, crime-ridden metropolitan areas. Nor, ordinarily, do we try to make the public believe that we are doing something about a problem when in truth we are not. Judges are supposed to be calm, dispassionate, and committed to the principles of law. We have a particular responsibility to the Constitution, including the Fourth Amendment.
 
 
 61
 Judge Trott makes clear his distaste for the rules of law enunciated in Graham v. Connor and Tennessee v. Garner. It is unfortunate he feels that way--although that is his privilege. However, to call Chew a murderer and a rattlesnake is not. To accuse us of sending police officers to "the jaws of danger," Opinion of Judge Trott at 1472, demeans him and us. We are all experienced in the ways of law enforcement and of the Los Angeles Police Department. To talk of "judges tucked away behind magnetometers," Opinion of Judge Trott at 1463, is nonsensical.
 
 
 62
 There are serious legal issues involved in this case that warrant informed discussion. Here, as with so many important issues, by exchanging reasoned views we could increase each other's understanding, and the public's as well. Rational, enlightened debate in this case could advance the interests of justice and the welfare of society. Judge Trott has the knowledge and experience to make a significant contribution to our efforts to balance societal interests and individual rights. Perhaps next time he will do so.
 
 
 63
 As for this case, we are not free to abandon our responsibilities as Judge Trott suggests. We are not permitted by our oaths of office to leave the protection of constitutional rights to the unreviewed discretion of "a police chief, an elected mayor, a police commission, and an elected city council." Opinion of Judge Trott at 1475. Today we do, however, leave the final answer as to the reasonableness of the city's policy and conduct to a jury, as the Constitution and our laws command.
 
 
 64
 Judge Trott grossly mischaracterizes today's holdings with respect to the use of excessive force. We do not send police dogs to the sidelines. We reverse a summary judgment order, so that there may be a full and fair factual trial before a jury of "the People" regarding the practices followed by the Los Angeles Police Department. No one should fear or condemn such a trial, least of all a judge experienced in the law and in the legal process. The truth cannot be harmful in this case. The public has a right to know how the Los Angeles Police Department is training and using dogs that are capable of killing or maiming human beings--to know whether the City is acting within the law. In addition, the appellant, who was seriously injured, has a right to compensation if the police department has acted in an unconstitutional manner. To say, as does Judge Trott, that there is simply no legal question here is to denigrate the Constitution. It is to say that the police, unlike all others, are above the law--that their decisions as to how and when deadly force shall be used are immune from judicial review. That way lies the beginning of the police state and the end of freedom.
 
 VI. Conclusion
 
 65
 The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART, and the case is REMANDED for further proceedings against the City of Los Angeles only.
 
 
 66
 WILLIAM A. NORRIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 67
 Thane Carl Chew was stopped by a Los Angeles Police Department ("LAPD") officer for a traffic violation and identified himself by presenting his driver's license. When the officer returned to his car to check Chew's record, Chew ran away. The officer pursued Chew, who scaled several fences during the chase before ultimately hiding in a scrapyard. During the subsequent search, which involved a number of officers and several K-9 units, Officer Bunch unleashed a police dog named Volker to find Chew. Defendants stipulated for summary judgment purposes that Chew "tried to surrender peacefully once he realized he had been found" by Volker. Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 2 [hereinafter "Defendants' Reply"]. Nevertheless, Volker seized Chew by biting him hard and holding on to him. Volker was out of Officer Bunch's sight when he located Chew and initiated his attack. Volker's attack left Chew with severe bite injuries on his arm and torso. At the time Officer Bunch released Volker, Bunch knew only that there were three outstanding warrants for Chew's arrest on unspecified felony charges. Officer Bunch had no reason to believe Chew was armed.
 
 
 68
 The City of Los Angeles and the four individual officers charged with the policymaking responsibility for the LAPD canine policy (then-Chief Daryl Gates, Captain Patrick McKinley, and Sergeants Donn Yarnall and Mark Mooring),[1] moved for summary judgment on the ground that the LAPD canine policy was constitutional. In their summary judgment papers, they made no reference to the facts of Chew's seizure by Volker. They merely submitted the LAPD's written canine policy and asked the court to declare it constitutional as a matter of law.[2] The individual policymaking defendants also argued that they were entitled to summary judgment on the ground of qualified immunity. The district court awarded these defendants summary judgment, which Chew appealed after the jury rendered a verdict in his favor against Officer Bunch.
 
 
 69
 * The Constitutionality of the LAPD Canine Policy
 
 
 70
 * This appeal requires us to judge the constitutionality of the LAPD canine policy under a well established principle of excessive force law: Deadly force may not be used to prevent the escape of a suspect unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985).
 
 
 71
 In Garner, police shot and killed a burglary suspect trying to escape by climbing a backyard fence. The suspect, Edward Garner, an eighth grader, was 15. He was unarmed. Ten dollars and a stolen purse were found on his body. See Garner, 471 U.S. at 3-4, 105 S.Ct. at 1697-98. The issue presented in Garner was the constitutionality of a Tennessee statute that permitted the use of "all necessary means" to apprehend fleeing suspects, whether dangerous or not. Id. at 4, 105 S.Ct. at 1697-98. The Supreme Court held that the Tennessee statute violated the Fourth Amendment insofar as it permitted the use of deadly force to prevent the escape of a felony suspect who "poses no immediate threat to the officer and no threat to others." Id. at 11, 105 S.Ct. at 1701. In explaining its decision, the Court said: "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape." Id. (emphasis added).
 
 
 72
 In this appeal, we must apply Garner to decide the constitutionality of a municipal policy which permits the use of police dogs to prevent the escape of all felony suspects, regardless whether the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. at 3, 105 S.Ct. at 1697. See Los Angeles Police Department Canine Unit Manual at 5, 9, 38, 39, 41, 44, 62 [hereinafter "LAPD Canine Manual"].[3]
 
 
 73
 The LAPD canine policy tracks the Tennessee statute in that it does not differentiate between dangerous and non-dangerous felony suspects. The only material difference between the LAPD policy and the Tennessee statute is that the statute authorized the use of "all means necessary," whereas the policy authorizes only the use of dogs. If the use of the LAPD dogs constitutes the use of deadly force, Garner would stand in the way of defendants' motion for summary judgment because the LAPD canine policy would be unconstitutional, as the Tennessee statute was unconstitutional, for permitting the use of deadly force to prevent the escape of felony suspects who do not pose "a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3, 105 S.Ct. at 1697. Accordingly, defendants' summary judgment motion in its present form must be denied because the critical question whether the use of LAPD dogs, as trained and deployed, constitutes the use of deadly force cannot be decided as a matter of law on the summary judgment record before us.
 
 
 74
 Deadly force is force that creates a substantial risk of causing death or serious bodily harm.[4] A gun plainly qualifies as deadly force. Whether a dog also qualifies depends on how it is trained to behave when confronting a suspect. For example, a dog trained to find a suspect and bark until the dog's handler arrives would plainly not qualify as an instrument of deadly force.[5] But a German Shepherd that is behaviorally conditioned to go directly for a suspect's jugular would surely qualify as an instrument of deadly force.
 
 
 75
 Whether a particular instrument of force qualifies as an instrument of deadly force is a question of fact.[6] Indeed, whether particular dogs as trained and deployed qualify as deadly weapons has been uniformly treated as a question of fact for the jury.[7] On the evidentiary record before us, the question whether or not the LAPD dogs, as trained to bite and hold suspects, constitute instruments of deadly force is an issue of fact that cannot be decided at summary judgment.
 
 
 76
 In their summary judgment papers, defendants fail to address this question: whether the dogs they train to bite and hold suspects are deadly force. They proffer no evidence whatsoever on the magnitude of the risk that their dogs will kill or seriously injure suspects. They provide no empirical data, for example, showing how frequently LAPD dogs bite the suspects they confront or the seriousness of the injuries suspects sustain when they are bitten. In short, defendants ask us to declare their canine policy constitutional as written without the benefit of evidence on the risk of harm the dogs represent.
 
 
 77
 In opposing the summary judgment motion, Chew proffered considerable evidence that the LAPD dogs, as trained and deployed, create a substantial risk of serious injury to suspects. He cites deposition testimony of Sergeant Yarnall that Volker was not trained to grip only a suspect's arm or leg, but instead was trained to bite whatever part of the suspect's body was necessary for an effective hold. See Chew Supplemental Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment at 14 (citing Deposition of Yarnall at 33-35). Chew also cites deposition testimony of then-Chief Daryl Gates that Gates was "[v]ery much" aware that Volker, as trained, could maim and even kill a suspect, Deposition of Daryl Gates at 21,[8] as well as testimony of Officer Bunch acknowledging that dog bites can be "fatal" or cause "serious and permanent" injuries, Deposition of Bunch at 30-32. Furthermore, Bunch acknowledged that Chew's injuries were "pretty severe," with "serious lacerations." Id. at 126. When read in a light most favorable to Chew, this evidence raises a genuine issue of material fact as to whether the LAPD dogs, as trained and deployed pursuant to the LAPD canine policy, create "a substantial risk of causing death or serious bodily harm." Model Penal Code Sec. 3.11(2).[9]
 
 
 78
 In sum, the Supreme Court held in Garner that by authorizing the use of deadly force against all fleeing felons, the Tennessee statute was based on an anachronistic brightline distinction between felons and misdemeanants. As the Court made clear, the critical factor in determining when the use of deadly force is warranted is not whether the law classifies the suspect's crime as a felony or as a misdemeanor, but whether the suspect poses a significant threat of harm to others. See Garner, 471 U.S. at 11, 14, 19-20, 105 S.Ct. at 1701, 1702-03, 1705-06. The LAPD canine policy relies upon this same outdated and constitutionally irrelevant distinction between felonies and misdemeanors. See LAPD Canine Manual at 5, 9, 38, 62. Thus, if the LAPD dogs, as trained and deployed, constitute instruments of deadly force, then the LAPD canine policy violates the Fourth Amendment in exactly the same manner as did the Tennessee statute because it fails to limit the application of deadly force to those suspects who pose a significant threat to others. Whether the LAPD dogs constitute instruments of deadly force is a genuine issue of fact which precludes summary judgment on the theory advanced by defendants--that the LAPD canine policy, as written, is constitutional as a matter of law.
 
 B
 
 79
 It is important to make clear that even if the unleashing of Volker constituted the application of deadly force against Chew, it would not have been excessive force if Officer Bunch had probable cause to believe that Chew posed a significant threat of serious bodily harm to themselves or to others. If he had probable cause to believe Chew posed such a threat, the use of deadly force to prevent his escape would have been objectively reasonable under Garner.[10] In that scenario, Chew would have no standing to challenge the constitutionality of the LAPD canine policy because he would have suffered no constitutional injury.
 
 
 80
 Whether Officer Bunch had probable cause to believe Chew posed a significant threat of serious physical harm to others is an issue of fact that cannot be resolved on summary judgment.[11] Officer Bunch knew that Chew was a felony suspect, but the nature of the felonies was unknown. And after Garner, Chew's suspected felony status alone was insufficient to create the probable cause necessary to use deadly force. See Garner, 471 U.S. at 14, 105 S.Ct. at 1703 ("[T]he assumption that a 'felon' is more dangerous than a misdemeanant [is] untenable."). The evidence in the summary judgment record does not establish as a matter of law that Chew posed any greater threat than Edward Garner did. In neither case did the officer have reason to believe the suspect was armed. In both cases, there was probable cause to believe the fleeing suspect was a felon, but no reason to believe he "pose[d] a significant threat of death or serious physical injury to the officer or others." Id. at 1452. Finally, in neither case did the circumstances of the attempted escape add anything to suggest that the suspect was dangerous. Garner ran from the home where the burglary was committed through the backyard to a fence, which he had begun to climb when he was shot. Chew made a break for it while talking peacefully to the officer who had stopped him for a traffic violation, jumped several fences, and was hiding in a scrapyard when he was found by Volker. Despite Chew's attempt to surrender peacefully, see Defendants' Reply at 2, Volker seized Chew by biting him repeatedly. On these facts, we cannot grant summary judgment to defendants on the ground that Chew posed the requisite threat as a matter of law any more than we could have decided that Garner posed the same threat as a matter of law.[12]
 
 C
 
 81
 In echoing defendants' refrain that the LAPD's canine policy is constitutional as a matter of law, Judge Trott raises the specter that our decision today may lead to "the elimination of the use of police dogs in this circuit to find hiding felony suspects," no matter how the dogs are trained or deployed. Opinion of Judge Trott at 1463. To dramatize the importance of well-trained police dogs to law enforcement and the public safety, Judge Trott recounts the story of Pascha, the police dog that helped the LAPD apprehend a career violent criminal known as the "Balcony Burglar." Id. at 1473. However, the heroic story of Pascha has no bearing on the question before us: whether on this record defendants are entitled to summary judgment.
 
 
 82
 Like Judge Trott, I recognize that Pascha was a great hero. Also like Judge Trott, "I do not believe that the deployment per se of police dogs to find hiding felony suspects is unreasonable." Id. at 1472.[13] However, I don't buy Judge Trott's inflammatory rhetoric and doomsday prediction that denying defendants summary judgment will prevent the use of all police dogs in all instances. Lest my opinion be misinterpreted, I emphasize two points.
 
 
 83
 First, I am not saying that all police dogs, regardless of how they are trained and deployed, constitute deadly force. I am saying only that whether the police dogs, trained by the LAPD to bite and hold, are instruments of deadly force is an issue of fact that cannot be resolved on the summary judgment record before us. There are obviously many ways to train and deploy a police dog so that it is not deadly force, one of which is the "find and bark" policy that is apparently once again in use by the LAPD. See supra note 5. Whether or not a dog is permitted to roam out of sight of its handler, as Volker was, would be another factor to consider.
 
 
 84
 Second, I am not saying that the use of a police dog, even if trained to deliver deadly force, is necessarily unreasonable. I am saying only that under Garner, if a dog is trained to deliver deadly force, then the Fourth Amendment requires that its use be limited to those situations where there is probable cause to believe that the suspect poses a significant threat of death or serious bodily harm. In the case of the Balcony Burglar, which involved the pursuit and apprehension of a person suspected of committing numerous murders, rapes, and robberies, Pascha's use, whether deadly force or not, plainly did not violate the Fourth Amendment.
 
 II
 The City's Monell Liability
 
 85
 In resting its summary judgment motion solely on the argument that the LAPD's "find, bite, and hold" canine policy is constitutional as a matter of law, the City conceded that Officer Bunch acted in accordance with LAPD policy when he unleashed Volker to hunt down and seize Chew. See Opinion of Judge Reinhardt at 1444 n. 13. On appeal, following the jury verdict that Officer Bunch violated Chew's Fourth Amendment rights, the City has changed its tune. It now argues that Officer Bunch's actions constituted nothing "more than ... a random act or isolated event that resulted in a constitutional rights violation." Appellees' Br. at 31. In other words, it argues that it is not liable for Chew's dog bite injuries because even if Volker's use in this case constituted an unreasonable seizure in violation of the Fourth Amendment, the City was not the "moving force" behind the violation. Id. at 32 (stating that "[t]here is no evidence of any policy to engage in the actions attributed to the officer"). See Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (a city is liable only if city policy "causes" or is "the moving force" behind a constitutional violation).
 
 
 86
 The City's appellate position is a 180-degree reversal from its stipulated position below that Officer Bunch's use of Volker to seize Chew complied fully with the LAPD canine policy. I agree with Judge Reinhardt that we must hold the City to the concession it made for summary judgment purposes, see Opinion of Judge Reinhardt at 1444-45,[14] and reject the City's new Monell position--which it takes for the first time on appeal--distancing itself from Officer Bunch's conduct.[15]
 
 III
 Qualified Immunity[16]
 
 87
 The individual defendants (Gates, McKinley, Yarnall, and Mooring), who had the policymaking responsibility for the LAPD canine policy, argue that even if the policy did violate the Fourth Amendment, they would have no liability for Chew's injuries because they enjoy qualified immunity. The doctrine of qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
 
 
 88
 * The doctrine of qualified immunity requires a two-prong inquiry: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993). The first prong involves a pure question of law for the court to decide, Mendoza v. Block, 27 F.3d 1357, 1360-61 (9th Cir.1994); the second prong involves a mixed question of fact and law requiring the application of the clearly established law to the facts of the particular case.
 
 
 89
 * The first prong of the qualified immunity test requires us to ask whether the Fourth Amendment principles governing the use of police dogs to prevent suspects from escaping were clearly established at the relevant time. In Mendoza, also a dog bite case, the officers argued that the law governing the use of police dogs was not clearly established because of the paucity of case law specifically addressing the use of dogs in police work. We rejected that argument:
 
 
 90
 The deputies argue that the law guiding the use of police dogs at the time Mendoza was bitten was not clearly established. They point to the lack of case law addressing the use of dogs to locate fleeing suspects, and argue that under the circumstances they could not reasonably have known how to pattern their conduct so as to avoid liability.
 
 
 91
 * * * * * *
 
 
 92
 This does not mean, however, that there was no clearly established law that would indicate to the deputies that a constitutional right might be violated when using a dog during an arrest. Mendoza argues that the use of a police dog in this case constituted excessive force. Officers have a considerable amount of guidance from the courts in the permissible use of force while making an arrest. It is clearly established that "[t]he use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure." White v. Pierce County, 797 F.2d 812, 816 (9th Cir.1986). "The reasonableness of force is analyzed in light of such factors as the requirements for the officer's safety, the motivation for the arrest, and the extent of the injury inflicted." Id. This analysis applies to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or use of a dog. We do not believe that a more particularized expression of the law is necessary for law enforcement officials using police dogs to understand that under some circumstances the use of such a "weapon" might become unlawful. For example, no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control. An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury. See Anderson, 483 U.S. at 640 [107 S.Ct. at 3039].
 
 
 93
 We therefore hold that the deputies' use of the police dog is subject to excessive force analysis, and that this law is clearly established for purposes of determining whether the officers have qualified immunity.
 
 
 94
 Id., 27 F.3d at 1362 (emphasis added).
 
 
 95
 Mendoza is controlling authority that the first prong of the qualified immunity test is satisfied in this case: the use of LAPD dogs is governed by established principles of excessive force law. It is a basic tenet of excessive force law that deadly force may be used only if necessary to prevent the escape of a suspect who poses "a significant threat of death or serious physical injury." Garner, 471 U.S. at 3, 105 S.Ct. at 1697. Thus, Garner held unequivocally that deadly force cannot be used to prevent the escape of all felons regardless of the danger they pose to others. Deadly force may only be used to prevent the escape of some felons--those who pose a serious threat to the safety of others.
 
 2
 
 96
 The second prong of the qualified immunity inquiry requires us to apply the clearly established principles of excessive force law to the facts of the particular use of force in this case. Here we must ask whether, in light of the clearly established law governing the use of force, a reasonable officer in defendants' policymaking position could have believed it constitutional to adopt a policy permitting the use of dogs to bite and hold felony suspects, regardless whether they posed "a significant threat of death or serious physical injury to the officer or others." Id. at 1452.
 
 
 97
 In Garner, the Court held that a Tennessee statute violated the Fourth Amendment to the extent it permitted the use of deadly force to prevent the escape of felons who did not pose a significant threat of serious harm to others. After Garner, it could not have been clearer to the defendants that the LAPD canine policy was unconstitutional to the extent it authorized the use of deadly force to prevent the escape of felony suspects who did not pose the requisite threat. Because the LAPD policy does not limit the use of police dogs to felony suspects reasonably believed to be dangerous, the question whether a reasonable officer could have believed the LAPD canine policy was constitutional turns on whether a reasonable officer could have believed the use of LAPD dogs such as Volker did not constitute the use of deadly force.
 
 
 98
 That is a question we cannot decide on the summary judgment record before us. As I have already explained, a genuine issue of fact exists whether the LAPD dogs, as trained and deployed, constitute deadly force. See supra at 1454-55. For emphasis, I will repeat that defendants proffered no evidence in support of their summary judgment motion regarding the danger posed by the LAPD dogs, such as evidence of the type, frequency, and severity of injuries they have inflicted. On the other hand, Chew offered evidence such as the deposition of ex-Chief Gates, who testified that he was "[v]ery much" aware that Volker, as trained, could maim and even kill a suspect. See supra at 1454. Accordingly, because we cannot decide whether a reasonable policymaker could have believed that the LAPD dogs were not deadly force, we cannot decide that defendants are entitled to summary judgment on the ground they rely upon in their motion--that a reasonable officer could have believed the LAPD canine policy was constitutional as written.[17]
 
 B
 
 99
 Defendants' claim of qualified immunity is based almost exclusively on the Sixth Circuit's decision in Robinette v. Barnes, 854 F.2d 909 (6th Cir.1988). In that case, a police dog bit a suspect's neck and killed him, an event that the Sixth Circuit said was an "extreme aberration." Id. at 912.[18] On the record before it, the court held that that particular dog did not constitute deadly force, and that the use of non-deadly force was reasonable under the totality of circumstances of the case. See id. at 912-13. Alternatively, the court held that even if the dog was a deadly weapon, its use would have been reasonable because the suspect "threatened [the officer's] safety and the safety of the other officers present." Id. at 913. Defendants here argue they are entitled to qualified immunity because Robinette was the only relevant federal court of appeals opinion on the books when they adopted the LAPD canine policy.
 
 
 100
 In Mendoza, we discounted Robinette as authority on the issue of qualified immunity in other dog bite cases because it was "fact-specific." See Mendoza, at 1361-62 ("It is therefore questionable whether fact-specific case law guided the deputies' use of a police dog when they arrested Mendoza."). We did not regard Robinette as an automatic guarantee of qualified immunity to officers in other dog bite cases. Instead, we affirmed the district court's award of qualified immunity because the district court had made a finding of fact, following an evidentiary hearing, that "Mendoza was fleeing arrest for a bank robbery ... [t]he deputies believed he was armed ... [and] the deputies could reasonably have believed he posed a danger not only to themselves but also to the property owners." Id. at 1362. Under these findings of fact, the use of police dogs to prevent Mendoza's escape would satisfy the requirements of Garner even if the dogs constituted deadly force. See Garner, 471 U.S. at 11-12, 105 S.Ct. at 1701-02.
 
 
 101
 My colleagues seem to think that after Robinette, a reasonable officer could have believed it was constitutional to deploy German Shepherds trained to bite and hold even non-dangerous suspects. Implicit in their reasoning is the assumption that it follows, as the night the day, that once a particular dog is judicially determined to be an instrument of non-deadly force, a reasonable officer could believe that no dog is an instrument of deadly force, however trained and deployed.
 
 
 102
 My analysis rejecting defendants' claim of qualified immunity based on Robinette is supported not only by Mendoza, but also by Marley v. City of Allentown, 774 F.Supp. 343 (E.D.Pa.1991), aff'd without opinion, 961 F.2d 1567 (3d Cir.1992). Because the Marley court applied qualified immunity analysis to the precise issue presented in this case--a claim of qualified immunity based on Robinette--it is instructive to lay out Marley in some detail.
 
 
 103
 Exactly as in this case, the officer in Marley staked his claim of qualified immunity on Robinette, moving for a directed verdict on the ground that the Sixth Circuit "said that the use of a police dog was not deadly force." Transcript of district court proceedings in Marley v. City of Allentown, July 2, 1991, at 188-89. The district court denied the motion, and the case went to the jury with the instruction that "[d]eadly force means force that's likely to kill or likely to seriously injure. You heard about the training of the police dog and how it's handled. You need to determine whether or not that was deadly force under that definition." Id. at 200. Following the jury's verdict against the officer, he moved for judgment notwithstanding the verdict, again arguing that he was entitled to qualified immunity on the basis of Robinette.
 
 
 104
 In denying the motion, the Marley court used the same level of generality we later approved in Mendoza to determine whether the applicable law was clearly established at the time of the officer's conduct. The Marley court refused to limit itself to police dog cases and instead considered the qualified immunity claim in light of the generic excessive force principles laid down in cases such as Garner. The Marley court observed that "[i]n Robinette, the ... Sixth Circuit merely applied [Garner ] to the facts of the case before it" and concluded that there was no Fourth Amendment violation. 774 F.Supp. at 345. The Marley court then explained that the application of Garner to the facts of its dog bite case led to a different result than the result in Robinette. Accepting the jury finding that the dog represented deadly force, the court held that in light of Garner, no reasonable officer could have believed it was lawful to use the dog to seize a fleeing suspect who "one could reasonably conclude ... posed no threat to the officer." Id.
 
 
 105
 Marley's qualified immunity methodology--looking beyond dog bite cases to generic principles of excessive force jurisprudence and then applying those principles to the facts of the particular case--is not only correct, it is mandated by our recent decision in Mendoza. Mendoza teaches that under the first prong of qualified immunity analysis, generic principles of excessive force law apply regardless whether the particular instrumentality of force involves "physical restraint, use of a baton, use of a gun, or use of a dog." Mendoza, 27 F.3d at 1361-62. Garner provided explicit guidance for the LAPD policymakers that if they train dogs to bite and seize suspects in a way that creates a "substantial risk of causing death or serious bodily harm," Model Penal Code Sec. 3.11(2), they had better restrict their use to suspects reasonably believed to be dangerous.
 
 
 106
 Throughout Part IV.B.2 of Judge Reinhardt's opinion, my colleagues scramble their qualified immunity analysis by failing to consider separately the two independent prongs of the qualified immunity test. See supra at 1457, 1458. They do so because they fail to recognize that prong one--the "clearly established" law prong--raises a pure question of law that does not turn on the particular facts of the case; the facts do not enter into the analysis until we reach the second prong, where we apply the established law--in this case generic principles of excessive force law--to the facts. This analytical flaw is demonstrated by the way they criticize my use of Mendoza and Marley as precedent. See Opinion of Judge Reinhardt at 1448-49. I cite both cases as authority that the law governing all excessive force cases, regardless of the instrument used to apply the force, is "clearly established." Indeed, I cite Mendoza as controlling circuit authority that the first prong of the qualified immunity inquiry is satisfied in excessive force cases by the generic principles established in Garner. Mendoza should foreclose any further discussion on the first prong. In criticizing my limited use of Mendoza and Marley as precedent, my colleagues discuss the facts of those cases, as well as the facts of Chew's case, in a way that injects facts into what should be a pure question of law: "Was the law governing the official's conduct clearly established?" Act Up!, 988 F.2d at 871. The result is a fundamental and far-reaching error in deciding the qualified immunity issue at the wrong level of generality.[19]
 
 
 107
 My colleagues also fail to recognize that I make use of Mendoza and Marley as authority that the second prong of the qualified immunity test is fact-specific. In Mendoza, the district court granted qualified immunity on the basis of facts it found at a pre-trial evidentiary hearing; in Marley, the jury returned a verdict against the officer. The district court subsequently denied the officer's motion for JNOV. In other words, even though both were dog bite cases, the Mendoza and Marley courts reached different results on the qualified immunity issue by applying established generic principles of excessive force law to the particular facts of the case.[20]
 
 C
 
 108
 Another reason offered by my colleagues for cloaking the policymaking officers with qualified immunity is that the LAPD canine policy was "a longstanding official policy, which was well-known and similar to the policies employed in many police departments throughout the nation, none of which had been judicially questioned." Opinion of Judge Reinhardt at 6978. First, there is no basis in the record for the majority's assertion that the policy was "well-known" and "similar" to other canine policies. Second, an unconstitutional police practice does not metamorphose into a constitutional practice by escaping judicial scrutiny over time. The happenstance that a particular police practice has not yet been "judicially questioned" is meaningless. Since courts do not sua sponte review police practices, the fact that a practice has not yet been "judicially questioned" may simply mean that an actual case or controversy that squarely presents the issue has not found its way into a published opinion.
 
 
 109
 To give the majority its due, it at least acknowledges that if a police policy is not " 'meaningfully distinguishable' " from a policy that has been declared unlawful, then qualified immunity may not be invoked no matter how widespread and longstanding the policy is. Opinion of Judge Reinhardt at 1449-50 (quoting Wood v. Ostrander, 879 F.2d 583, 592 (9th Cir.1989)). What the majority fails to explain is how the use of LAPD dogs--trained to roam beyond the handler's control, bite hard, and seize even non-resisting, non-dangerous suspects--is "meaningfully distinguishable" for Fourth Amendment purposes from the use of guns or other deadly weapons against non-dangerous suspects.
 
 
 110
 From the victim's perspective, deadly force is deadly force, regardless of whether the force comes from the muzzle of a gun or the muzzle of a dog. Nor does it matter from the perspective of the law. The Fourth Amendment requires that an officer's use of force be reasonable regardless whether the force involves "physical restraint, use of a baton, use of a gun, or use of a dog". Mendoza, 27 F.3d at 1362. Garner specifically limits the use of deadly force regardless of the instrumentality used. Garner, 471 U.S. at 31, 105 S.Ct. at 1711-12 (O'Connor, J., dissenting) (criticizing the majority's failure "to limit its holding to the use of firearms" only); see also Mathis v. Parks, 741 F.Supp. 567, 572 (E.D.N.C.1990) ("Garner makes clear that there are limits to the use of deadly force against arrestees, regardless of the nature of the instrumentality used in applying the force."). Because defendants have failed to produce a scintilla of evidence on the issue of the frequency and severity of the injuries caused by LAPD dogs, I cannot accept my colleagues' unexplained assumption that LAPD dogs such as Volker are "meaningfully distinguishable" from a gun in that they pose no "substantial risk of causing death or serious bodily harm." Model Penal Code Sec. 3.11(2).
 
 
 111
 In sum, after Garner, no reasonable officer could believe it lawful to authorize the use of deadly force against suspects who do not pose "a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3, 105 S.Ct. at 1697. Accordingly, the individual defendants' claim of qualified immunity must necessarily turn on the factual question whether a reasonable policymaker could have believed that dogs trained pursuant to the LAPD canine policy did not pose "a substantial risk of causing death or serious bodily harm." Model Penal Code Sec. 3.11(2). In their motion for summary judgment, defendants stand mute on this question. They merely ask that their policy, as written, be held constitutional as a matter of law. At this stage of the litigation we cannot cloak the individual defendants with qualified immunity since there is no evidence that would permit us to determine that a reasonable officer could have believed LAPD dogs such as Volker do not constitute deadly force.
 
 CONCLUSION
 
 112
 Defendants are not entitled to summary judgment on the ground that the LAPD canine policy, as written, is constitutional as a matter of law. Furthermore, the City is not entitled to summary judgment on a Monell defense because, for purposes of summary judgment, it admitted to being the moving force behind Officer Bunch's deployment of Volker. Finally, the individual defendants who are responsible for the LAPD canine policy are not entitled to summary judgment on the basis of qualified immunity.
 
 
 113
 TROTT, Circuit Judge, Concurring and Dissenting:
 
 
 114
 My respected colleagues have come to some unsupportable conclusions about this case that are irreconcilable with the real world of police work and its hazards. In so doing, I believe they have inappropriately hobbled the police in this circuit with respect to the use of a valuable tactic in connection with the difficult and perilous task of pursuing and arresting felons who seek to evade arrest by secreting themselves in menacing environments. Thus, I am unable to join in the part of Judge Reinhardt's opinion holding that the initial release of Volker by Officer Bunch constituted a use of unreasonable force.[1]
 
 
 115
 * At this moment in history, criminals are succeeding in doing what no foreign power has ever been able to accomplish: they have invaded our streets, parks, beaches, and backyards and made many feel like prisoners in their own homes. More and more, criminals are carrying and using firearms. This appalling condition is a matter of common knowledge and concern. As I write this dissent, Mayor Sharon Pratt Kelly of Washington, D.C., our nation's capitol no less, has asked the President of the United States to call out the National Guard to combat crime in her city. The President himself says that violence is "tearing the heart out of America." Jonathan Alter, one of our nation's keenest observers, describes our condition this way:
 
 
 116
 The paradox of the American gun culture is that it is undermining the very values it was meant to protect. Remember Franklin Roosevelt's famous Four Freedoms? These were what we ostensibly fought World War II over. One of them was "freedom from fear." That battle has been lost. As crime grows arithmetically, fear grows geometrically. Even outside major cities, ours is now a land of real freedom only during daylight and in certain neighborhoods. We've reached a point in recent years where otherwise optimistic, spontaneous people believe they must constantly peer over their shoulders as if they were being pursued by the secret police in some old communist regime.
 
 
 117
 This routinized fear is now so much a part of American life that we've begun to take it for granted. We instinctively avoid large sections of cities, using mental maps in our heads that are unavailable to tourists. In my case, it was a stay in Japan that jolted me into recognizing how much freedom I'd lost at home. Japan is crowded and culturally stifling, but it's possible to walk in a park in Tokyo at midnight without the slightest trepidation, just as it was here as recently as the 1950s. This freedom felt strange to me, as if a state of fear about physical safety is normal. And it is. Barricading oneself at home all night is now natural; wandering around freely and alone--once the quintessential American experience--is foolhardy. Roads like Route 66 once symbolized freedom; they now symbolize danger. Even a time-honored cultural tradition like flipping the bird to some idiot driver is now in jeopardy. Instead of just screaming back, he might blow your head off.
 
 
 118
 Jonathan Alter, There's a War On at Home, Newsweek, Sept. 27, 1993, at 42. Given this climate, the job of a police officer has never been more difficult, or more dangerous.
 
 
 119
 Judge Reinhardt finds fault with my interest in relating our decision in this case to the world around us. I do so because I am not comfortable entombed in the purity of abstractions as we decide in Constitutional terms whether a tactic used by the police to apprehend hiding felons is reasonable. I believe that before judges tucked away behind magnetometers and deputy marshals in the safety of courtrooms tell police officers and hiding felony suspects which seizures are reasonable and which are not, we must integrate into our decision making process a thorough understanding of the context of the issue and all the practical ramifications of our holding, one of which may be the elimination of the use of police dogs in this circuit to find hiding felony suspects. Because of fear of lawsuits and liability, this decision may be fatal to canine units, and by their demise, the ability of police to combat criminals will be seriously hampered. See Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1992) ("Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in their unflinching discharge of their duties.' ") (citation omitted). Thus, it seems to me that the task of interpreting the principles in our Constitution and applying them to various conditions and circumstances requires an understanding of human existence that is informed by more than law books.
 
 
 120
 Furthermore, I do not believe that grounding a holding on this issue in the realities of our times is either "succumbing to hysteria" or "joining the pack." The "pack," as Judge Reinhardt pejoratively chooses to call them, appear to me to include decent people genuinely worried about the world in which they and their children live; and the "hysteria" sounds to me like appropriate concern about their safety threatened by rampaging criminals. I doubt that we serve the People well by dismissing them as an hysterical pack or by telling them that their elected leaders speaking out on this subject are hypocrites.
 
 
 121
 Ample precedent exists to support my approach to deciding whether something is unreasonable under the Fourth Amendment. Part of the genius of that amendment is its use of principles that are flexible enough to respond to evolving challenges and conditions. Three examples should suffice to make this point.
 
 
 122
 When the Supreme Court decided in New Jersey v. TLO, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) that searches of schoolchildren by teachers and administrators shall depend not on probable cause, but "on the reasonableness, under all the circumstances, of the search," id. at 339, 105 S.Ct. at 741, the Court relied greatly on information about contemporary conditions in schools. The Court said, "Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." Id. at 339, 105 S.Ct. at 741.
 
 
 123
 The Court used the same approach in Michigan State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) when it decided that sobriety checkpoints to combat drunk driving did not entail unreasonable seizures of motorists. In rejecting arguments that such seizures were unreasonable under the Fourth Amendment, Chief Justice Rehnquist said,
 
 
 124
 No one can seriously dispute the magnitude of the drunken driving problem or the State's interest in eradicating it. Media reports of alcohol related death and mutilations on the nation's roads are legion. The anecdotal is confirmed by the statistical. "Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage."
 
 
 125
 Id. at 451, 110 S.Ct. at 2485-86 (citations omitted). In a concurring opinion, Justice Blackmun observed that "for the period from 1900 through 1969 motor vehicle deaths in the United States exceeded the death toll of all our wars," adding that he was "pleased ... that the Court is now stressing this tragic aspect of American life." Id. at 456, 110 S.Ct. at 2488.
 
 
 126
 Finally, the Supreme Court ended segregation by race in public schools based on a look at the reality of segregated education, not merely by resorting to theorization. The Court said, "In approaching this problem, we cannot turn the clock back to 1868 when the [Fourteenth] Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws." Brown v. Board of Education of Topeka, 347 U.S. 483, 492-93, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).
 
 
 127
 Thus, just as contemporary reality has been used to justify school searches, drug testing, sobriety check points, and magnetometers in airports, I believe contemporary reality has a place in deciding this case. No one "likes" these invasive techniques, but they have become indispensable in our attempt to preserve our liberties from criminals.
 
 II
 
 128
 Chew was a fugitive. He was one of the class of people Mayor Kelly, President Clinton, and Jonathan Alter are concerned about. When braced by the police, he ran and hid in a scrapyard, a place filled with iron and steel implements easily used as weapons. He wedged himself between large steel dumpsters and covered his hiding place with cardboard to avoid being seen by a police helicopter hovering overhead. His own attorney has described this scrapyard as "massive." Three felony warrants were outstanding for Chew's arrest. The police knew about these warrants. No one could misunderstand Chew's motivation in fleeing. Yet, the majority claims this set of facts and circumstances would support a finding that Chew posed no immediate safety threat to anyone. Not only is this bizarre claim monumentally mistaken, but it translates into a holding that will make more perilous the work of police officers patrolling our streets.
 
 
 129
 Every police officer alive today in the United States of America understands that a suspected felon wanted by the law is one of the most dangerous criminals at large in our communities. The walls of law enforcement memorials across our nation are inscribed with the names of unsuspecting officers slain in routine traffic stops by persons like Chew. To claim that Chew engaged in no threatening behavior while hiding in a massive scrapyard badly misunderstands the threat he posed to those sworn to apprehend him. Such an hallucination is impeached many times over by the record. Police officers engaged in searches for hiding felony suspects know that their own lives are at risk. I respectfully believe the majority opinion does precisely what Justice Oliver Wendell Holmes cautioned against when he wisely said, "We must think things not words, or at least we must constantly translate our words into the facts for which they stand, if we are to keep to the real and the true." Oliver W. Holmes, Law in Science and Science in Law, in Collected Legal Papers 210, 238 (1920).
 
 
 130
 This case involves more than just stopping a fleeing suspected felon in flight. Yes, Chew was in a state of flight, but he had temporarily hidden in a dangerous environment, demonstrating an unwillingness to surrender. He was using concealment as a tactic to remain at large. Now, the duty of the police was to go into that environment, physically arrest him, and bring him out. This challenge is much different from chasing a running suspect, and it goes into dimensions that are distinguishable from and more demanding than those reviewed by the Supreme Court in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). See Robinette v. Barnes, 854 F.2d 909, 913-14 (6th Cir.1988) (commenting on the difference between a fleeing and a hiding felony suspect). Indeed, Tennessee v. Garner permits the use of significant force to apprehend a fleeing felon "[w]here the officer has probable cause to believe that the suspect poses a threat of serious harm to the officer or to others...." Id. 471 U.S. at 11, 105 S.Ct. at 1701. This is precisely the situation faced by the officers in this case, and I believe the force used to seize Chew was patently reasonable.
 
 
 131
 Once hidden, a fleeing suspected felon has an unmistakable advantage against an approaching officer. The potential for ambush under these circumstances is enormous. Ferreting out hiding criminals is a precarious task. As Sgt. Yarnell, who started the Los Angeles Police Department K-9 Unit, testified in his deposition, "To me, it's a very unsafe situation to go into a location where a suspect has concealed himself, especially in today's day. There are so many armed people out there, it's very, very dangerous." Any police officer who would walk unprotected into such an environment would only be doing so on the set of a television show. When a real police officer is assaulted, real injury can occur. This is precisely why the police used trained dogs. The dogs can quickly find hiding criminals, and thankfully, they can do so without endangering the lives of the police officers for whom the dogs work. As Sgt. Yarnell testified, "Dogs [can] search much more efficiently, much faster, and with greater safety than a human being."
 
 
 132
 As noted by the district court, "Chew fled before he could be checked for weapons." Chew v. Gates, 744 F.Supp. 952, 956 (C.D.Cal.1990). The officers may not have known for certain whether Chew had a weapon, but after he fled, it would have been more than foolish for them to assume he did not; and it would be singularly inappropriate for us to essentially force the police to make such a dangerous assumption.
 
 
 133
 Sgt. Yarnell testified that an officer must assume for the sake of his own safety that each suspect he is searching for is armed:
 
 
 134
 Q. [By Chew's counsel.] Let's assume that the handler has been given no reason to believe that he is armed.
 
 
 135
 A. Ah, but sir, this is the mistake. You cannot assume that the man is not armed. You will die. I mean, it is a realistic world out there, and I'm sorry, but that is the truth. And you must assume that each suspect that you are searching for is armed, for your own safety.
 
 
 136
 Q. Okay.
 
 
 137
 A. Okay? So unless you are told otherwise, for a fact, that he is not armed, you must assume that he is.
 
 
 138
 Q. All right.
 
 
 139
 A. But even--yes. I'm sorry. Go ahead.
 
 
 140
 Q. So that is part of the training that the officers receive?
 
 
 141
 A. That's part of the training from the day they are in the academy, and it's part of the training I give them, absolutely, yes.
 
 
 142
 Q. I thought that was so.
 
 
 143
 A. Well, it must be. Otherwise, you're going to die.
 
 
 144
 (emphasis added).
 
 
 145
 It is also correct that the officers may not have known the nature of the three felonies for which Chew was wanted, and that some felonies are nonviolent. But by fleeing, by jumping over at least four fences, and by hiding in a precarious environment, Chew became presumptively dangerous. Surely the officers who saw Chew on the fence of the scrapyard knew they did not have a benign check bouncer on their hands. Moreover, Chew was more than just a fleeing suspect. He had been formally charged by a court for felonies arising out of three separate episodes, thus demonstrating a pattern of lawless behavior. Yes, the precise nature of the three felonies might not have been immediately known to the officers, but they had ample probable cause based on Chew's flight and behavior (i.e., the totality of the circumstances), to believe the felonies were of a nature that made him dangerous. To hold otherwise is to be guilty of nothing short of nit-picking. Certainly Chew could have been searched for weapons the moment he was finally apprehended. No one could seriously argue otherwise. Bunch testified that when he found Chew, Chew was beating Volker with a metal pipe. Better Volker than Bunch.
 
 
 146
 The majority opinion unpersuasively attempts to water down the reality of these events, describing the search and pursuit as two "uneventful" hours. "Uneventful?" A helicopter in the air? One hundred and ten degree air temperature? Sixteen police officers surrounding an uncooperative suspected fleeing felon now cornered and hiding in a scrapyard? Incidently, there were at least three police dogs, including Volker, and three handlers combing the scrapyard looking for Chew. Why three and three? Because the officers believed the dogs could not last long in the extreme heat. Maybe this scenario would be uneventful to a judge, but not to any police officer at the scene. Time was of the essence. Among other things, all police officers know that if a fleeing felon escapes, the next time he is stopped, unsuspecting fellow officers will have an unmarked, silent rattlesnake on their hands. They must get him now, in the scrapyard and in the daylight, not permit him to escape to menace them or the public in the future. How the majority can claim, indeed even "emphasize", that "this was not an occasion on which the police were forced to make 'split second judgments' " completely escapes me.
 
 
 147
 Even Chew could not describe what happened as "uneventful." Here excerpted from his deposition is how he recounts this episode.
 
 
 148
 Q. [By the deputy city attorney.] Now, at the time that you were arrested on this matter, there were some felony warrants out for your arrest; is that correct?
 
 
 149
 A. From my understanding, yes.
 
 
 150
 Q. How many felony warrants were there?
 
 
 151
 ....
 
 
 152
 A. You mean when I got arrested?
 
 
 153
 Q. At that time, yes,
 
 
 154
 A. One.
 
 
 155
 Q. Okay. And what was that for?
 
 
 156
 A. Burglary.
 
 
 157
 ....
 
 
 158
 Q. Was it a residential burglary, if you recall?
 
 
 159
 A. Yes.
 
 
 160
 Q. What about the burglary conviction of October of '88 in Lancaster; was that also a residential burglary?
 
 
 161
 A. Yes.
 
 
 162
 ....
 
 
 163
 Q. Okay. And then what happened next?
 
 
 164
 A. [The officer who stopped me] proceeded back to his car.
 
 
 165
 Q. What happened next?
 
 
 166
 A. I lit a cigarette up.
 
 
 167
 ....
 
 
 168
 Q. Okay. And then what happened?
 
 
 169
 A. I remember I was getting scared?
 
 
 170
 Q. Why were you getting scared?
 
 
 171
 A. Because I was unaware [sic] of me having a warrant.
 
 
 172
 Q. And what was the warrant for?
 
 
 173
 A. My understanding was burglary.
 
 
 174
 Q. Was it a bench warrant or an arrest warrant, if you know?
 
 
 175
 A. That, I'm not sure of.
 
 
 176
 Q. Did you fail to appear for court?
 
 
 177
 A. Yes.
 
 
 178
 ....
 
 
 179
 Q. Okay. So you're aware of one warrant out for your arrest that apprised you of a burglary; is that correct?
 
 
 180
 A. Yes.
 
 
 181
 MR. DENNY: [Counsel for Chew.] And his failure to appear for that burglary charge.
 
 
 182
 ....
 
 
 183
 Q. And the officer went back to his car during that couple seconds?
 
 
 184
 A. Yes.
 
 
 185
 Q. What happened next?
 
 
 186
 A. I panicked.Q. Okay. Because of the warrant?
 
 
 187
 A. Yes.
 
 
 188
 Q. And what happened next?
 
 
 189
 A. I took off running.
 
 
 190
 Q. Did the officer ever frisk you at any time before he took off running?
 
 
 191
 A. Not that I remember.
 
 
 192
 Q. And where did you run to?
 
 
 193
 A. I think I was running eastbound if my recollection is--that's what I recall the direction.
 
 
 194
 Q. Did you cross San Fernando Road as you were running?
 
 
 195
 A. Yes.
 
 
 196
 Q. No particular place, but eastbound.
 
 
 197
 Q. How far did you run?
 
 
 198
 A. Until when?
 
 
 199
 Q. Until the first time you stopped.
 
 
 200
 A. Stopped or stopped running?
 
 
 201
 Q. Till the first time you stopped running.
 
 
 202
 A. Approximately 2,300 yards.
 
 
 203
 Q. Okay. And where were you when you stopped running?
 
 
 204
 A. In the scrap yard.
 
 
 205
 Q. Were you able to see the officer the first time you stopped?
 
 
 206
 A. Which officer?
 
 
 207
 Q. The one who had--you gave your license--who you gave your license to the first officer you saw?
 
 
 208
 A. I'm not sure.
 
 
 209
 Q. Did you look to see if he was chasing you?
 
 
 210
 A. Yes.
 
 
 211
 Q. And did you see him?
 
 
 212
 A. I couldn't tell you. I couldn't see him visually, but I saw his police car.
 
 
 213
 ....
 
 
 214
 Q. When you first started running, what happened?
 
 
 215
 A. I started to run.
 
 
 216
 Q. And what happened next?
 
 
 217
 A. I came to a fence, proceeded to climb it.
 
 
 218
 Q. Okay. What happened next?
 
 
 219
 A. I then took off running towards the, I guess it would be, southeast direction to the corner of the area that I was in.
 
 
 220
 Q. What happened next?
 
 
 221
 A. I was then going to proceed to jump another fence to get into a wash that was nearby.
 
 
 222
 Q. What happened next?
 
 
 223
 A. I looked to my right, I guess that would be south, and saw a police car.
 
 
 224
 Q. What happened next?
 
 
 225
 A. I then took off running again heading north if my directions are correct.
 
 
 226
 Q. What happened next?
 
 
 227
 A. I jumped another fence and proceeded running.
 
 
 228
 Q. What happened next?
 
 
 229
 A. I then jumped another fence and proceeded to run.
 
 
 230
 Q. What happened next?
 
 
 231
 A. I looked north of the scrap yard I was in at that particular time.
 
 
 232
 Q. And what did you see?
 
 
 233
 A. I saw between where the entrance gates come up and I saw what appeared to be a black and white police car driving northbound on Branford Street.
 
 
 234
 ....
 
 
 235
 Q. Okay. What happened next?
 
 
 236
 A. I then proceeded to run to the entrance gate.
 
 
 237
 Q. And where was that located?
 
 
 238
 A. Right there in front of Branford Street.
 
 
 239
 Q. What happened next?
 
 
 240
 A. I then approached--came up to the fence and proceeded to climb the fence.
 
 
 241
 Q. This is a fence on Branford?
 
 
 242
 A. Yes.
 
 
 243
 Q. Were you climbing--were you exiting the junk yard or entering the junk yard?
 
 
 244
 A. I was going to try to exit the junk yard.
 
 
 245
 Q. Okay. What happened next?
 
 
 246
 A. As I came to the top of the fence that I was climbing, I saw, if I remember right, two officers looking in the yard that wasthat I just came from, which was right next door.
 
 
 247
 Q. Okay. What happened next?
 
 
 248
 A. They both looked up at me or I should say I know of one for sure that looked up at me and saw me.
 
 
 249
 ....
 
 
 250
 Q. Okay. After you saw the two officers, which you indicated you believe that one of the officers saw you, what happened?
 
 
 251
 A. I then jumped back into the scrap yard, not junk yard but scrap yard as I know it, and proceeded to run back to where the direction that I saw the officer--the car drive by on Branford Street.
 
 
 252
 ....
 
 
 253
 Q. And what happened after you got to the top of the fence?
 
 
 254
 A. That's when I saw, if I remember right, officers.
 
 
 255
 Q. Okay. And what did you do then?
 
 
 256
 A. I jumped down off the fence back into the scrap yard because I saw one officer. Both of them might have looked. I'm not sure. I know one looked up at and so I then jumped back down there.
 
 
 257
 ....
 
 
 258
 Q. Okay. What happened after you got to the approximate point of Point F [referring to a diagram]?
 
 
 259
 A. I then looked--no. That was when I heard what appeared to be a helicopter.
 
 
 260
 ....
 
 
 261
 Q. Okay. And then what happened?
 
 
 262
 A. I then looked around.
 
 
 263
 Q. Okay. And you saw nothing but scrap metal; correct?
 
 
 264
 A. Yes. You might call it that, yes.
 
 
 265
 Q. And then what happened?
 
 
 266
 A. I then proceeded to hide myself.
 
 
 267
 ....
 
 
 268
 Q. Okay. How did you hide yourself?
 
 
 269
 A. I squeezed myself self in between what appeared to be--if I remember right, four dumpsters; one stacked on top of each other as one pile and the other eight which was one stacked on top of the other one were fairly closed to one another.
 
 
 270
 ....
 
 
 271
 Q. Hiding. You were hiding between the dumpster for about two hours?
 
 
 272
 A. Yes, around there, yes.
 
 
 273
 Q. During those two hours, did you see or hear anything?
 
 
 274
 A. Yes.
 
 
 275
 Q. What?
 
 
 276
 A. A helicopter.
 
 
 277
 Q. Okay. Anything else? What else?
 
 
 278
 A. Commotion.
 
 
 279
 ....
 
 
 280
 Q. Okay. Could you describe this commotion a little bit more, please, that you heard?
 
 
 281
 A. Well, it appeared to me it sounded like I heard--it sounded like not a regular voice but a voice over either a P.A. system, radio or--I don't know because I couldn't see.
 
 
 282
 ....
 
 
 283
 Q. Okay. Okay. You hid yourself at point I and you waited there about two hours; correct--
 
 
 284
 A. Correct.
 
 
 285
 Q. --until you were found; is that correct?
 
 
 286
 A. Correct.
 
 
 287
 ....
 
 
 288
 (emphasis added).
 
 
 289
 Chew was actively albeit silently resisting arrest. This entire episode was rife with life-threatening "split-second judgments" as the police searched for him. Bunch and Volker were in the yard for half an hour before Volker found him. Yet the majority opinion tries to characterize Chew's behavior as not menacing because he did not do "anything other than hide quietly." With all respect to my good friends, this is a false characterization that makes the event sound like a children's game of hide-and-go-seek. The majority's claim that a hiding quietly Chew posed "no immediate safety threat to anyone" adds new meaning to the word "absurd." Common sense tells us we must look at the circumstances from the perspective of the police, not the hiding suspect.
 
 
 290
 But perhaps the most upside-down argument in the majority's opinion is the following "syllogism":
 
 
 291
 1) A police dog is more likely to bite a hidden suspect than one out in the open;
 
 
 292
 2) Chew managed to conceal himself from the officers;
 
 
 293
 3) Therefore, Chew deserved to be protected from the dog.
 
 
 294
 This twisted logic inappropriately removes the responsibility for the increased risk from the suspect and places it in on the officers, effectively rewarding concealment, resistance, and a refusal to surrender. Chew was responsible for this risk. Are we to call off searches when a suspect conceals himself because the risk of dog bites--or for that matter shootings--is thereby increased?
 
 III
 
 295
 The recurring flaw in the majority's analysis is that it breaks the facts and circumstances of this case into disconnected pieces, gelds the pieces, and then argues that each deodorized piece does not demonstrate Chew was a safety risk. This approach is at war with the requirement that we measure the reasonableness based on the totality of the circumstances. The flaw is most apparent in the opinion's treatment of (1) Chew's behavior before he panicked ("[N]othing about Chew's appearance or demeanor gave the officer reason to believe he should search [Chew before he fled]."); (2) Chew's behavior in the scrapyard ("The defendants do not suggest that Chew engaged in any threatening behavior during this time, or that he did anything other than hide quietly."); (3) Chew's attempt to resist arrest by wedging himself between the dumpsters ("He did not, however, resist arrest to the point of offering any physical resistance to the arresting officers."); (4) the significance of the outstanding warrants ("[Because] the record does not reveal the type of felony ..., the existence of the warrants is of limited significance."); and (5) the length of the search ("Chew was trapped in the scrapyard for two uneventful hours...."). (emphasis added).
 
 
 296
 There are three errors of logic in this piecemeal approach. First, the opinion bases its ultimate conclusion on incomplete and mischaracterized premises. Second, the "no immediate safety threat to anyone" conclusion is tacitly assumed in each premise, i.e., the question is begged by sneaking the rabbit into the hat. Third, the fallacy of composition is mischievously at work insofar as each emasculated and quarantined piece of the whole is used to compel an adulterated and invalid conclusion. If this were a proper way to reason, which it manifestly is not, one could easily make the case that World War II wasn't really a significant threat to our national security, just as the majority opinion claims Chew's behavior that afternoon did not pose an "immediate safety threat to anyone." No rational jury could so find.
 
 
 297
 This same kind of analytical mischief is also at work in the manner in which the majority characterizes the LAPD's K-9 policy. Just as the threat posed by Chew's behavior is belittled, the threat posed by police dogs operating under the LAPD's policy is vastly exaggerated. The majority makes it sound like the purpose of the policy was to "maul" all suspects. This is untrue, as is the idea that dogs were trained to attack and bite all suspects. The controlling Canine Manual makes it clear that care is taken to minimize the physical danger to suspects:
 
 
 298
 All protection, criminal apprehension and search training shall incorporate control training. Control training includes false starts, outs,[2] and out from attack, call outs, long outs, out while fighting, hold, hold and bark and transports. Great emphasis shall be placed on training as it will ensure optimum control and will decrease the chances of accidental or unnecessary bites.
 
 
 299
 Metropolitan Div., Los Angeles Police Dep't., Canine Unit Manual 19-20. The training exercises in the Canine Manual demonstrate that the dogs are trained not to bite when biting is unnecessary, just as officers are trained not to shoot when it is not appropriate.[3]
 
 IV
 
 300
 "To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion'." Tennessee v. Garner, 471 U.S. at 8, 105 S.Ct. at 1699-1700 (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). In this respect, "reasonableness depends on not only when a seizure is made, but also how it is carried out." Id. (emphasis added). The question we must answer is "whether the totality of the circumstances justified a particular sort of ... seizure." Id. 471 U.S. at 8-9, 105 S.Ct. at 1699-1700 (emphasis added).
 
 
 301
 In my judgment, the totality of the circumstances I have outlined thus far are manifestly "exigent" as that concept has been used by the Supreme Court to justify certain exceptional police practices. See United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976) (allowing warrantless entry of a home while in "hot pursuit"). The circumstances most certainly create probable cause to believe Chew "posed a threat of serious harm to the officers or to others...." Tennessee v. Garner, 471 U.S. at 11, 105 S.Ct. at 1701. In addition to these integrated facts and circumstances that weigh heavily in this balancing process, I also note the following.
 
 
 302
 First, a biting dog is not a bullet from a firearm. A trained dog is much less dangerous than a shotgun. See Robinette, 854 F.2d at 912 (concluding the use of a properly trained police dog to apprehend a felony suspect does not constitute the use of deadly force). A police dog can inflict fatal wounds, but experience has shown that this is not a common event. Id. at 913. By comparison, when police shoot, they must always be prepared to accept the possibility of a fatality. Tennessee v. Garner stands as a witness to this reality. Indeed, while we have expended over eighteen months deciding this case, I have heard oral argument in an appeal involving the shooting by police in San Francisco of a recluse engaged in resisting the service of an administrative inspection warrant.[4] The estate of the accused argued in that case that the police should be liable under 42 U.S.C. Sec. 1983 for violating the decedent's rights because they entered the decedent's house with firearms when they should have used a "less violent alternative," i.e., police dogs. I quote from their brief:
 
 
 303
 If there eventually arose some compelling reason to seize Mr. Quade, police could have employed a canine unit. The San Francisco Police Department has police dogs that are specially trained to search for and discover persons hiding in buildings.
 
 
 304
 Police admit that a canine unit was available and could have been utilized. Appellees' own police expert acknowledged that a dog unit was a viable option and would have involved less chance of injury to Mr. Quade.
 
 
 305
 No doubt had Chew been shot, his estate would be arguing in this case that dogs should have been used to apprehend him because, of course, dogs represent a "less violent alternative."
 
 
 306
 Essentially, I agree with the Sixth Circuit:
 
 
 307
 Indeed, instead of generally causing deadly force to be used to apprehend criminals, we believe that these dogs often can prevent officers from having to resort to, or be subjected to, such force. Any attempt to apprehend a criminal suspect presents the officer with [a] difficult and frightening situation, but certainly an attempt to arrest a suspect hidden inside an unfamiliar building during the nighttime presents a particularly confusing one. The use of dogs can make it more likely that the officers can apprehend suspects without the risks attendant to the use of firearms in the darkness, thus, frequently enhancing the safety of officers, bystanders and the suspect.
 
 
 308
 Robinette, 854 F.2d at 914 (emphasis added). Searches for hiding suspects are very tense occasions where fingers are appropriately, but dangerously, near triggers. Accidental shootings are not uncommon.
 
 
 309
 Second, I see a compelling interest in protecting police from death or serious bodily injury at the hands of holed up criminals. The use of properly trained dogs to seize persons like Chew fosters this interest.
 
 
 310
 Third, before Los Angeles Police Department K-9 Unit police dogs are released, hiding suspects are given this warning: "This is the police. We are going to use a police dog to find you. There is a possibility you will be bitten by the dog. If you surrender now, the dog will not be used. You have one minute." This gives the suspect control over his own fate. See Tennessee v. Garner, 471 U.S. at 29, 105 S.Ct. at 1710-11 (O'Connor, J., dissenting) ("[T]o avoid the use of deadly force ..., the suspect need merely obey the valid order....").
 
 
 311
 Fourth, the massive deployment of police officers required to contain someone like Chew depletes their ranks elsewhere during the many hours that it takes to conduct a painstaking search of a scrapyard. Sgt. Yarnell testified that in an era of limited resources and severe budgetary constraints, economic concerns were a factor motivating the K-9 program.
 
 
 312
 Taking these factors into consideration in their totality, and realizing that all Chew had to do to avoid this fate was surrender, the scales balance easily in favor of the use of police dogs to assist in these types of seizures. I do not believe that the deployment per se of police dogs to find hiding felony suspects is unreasonable. Thus, I agree with the district court that the release of a police dog to apprehend Chew was objectively reasonable as a matter of law. See Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989). If wanted felony suspects normally surrendered and never attacked police officers, I suppose the result in this case might be different, but that is a fanciful world in which we do not live.
 
 
 313
 I am not persuaded by the majority's attempt to discredit Robinette v. Barnes, which Judge Reinhardt suggests was wrongly decided. In Robinette the suspect was hidden in a dark building in the nighttime, but the principle active in Robinette is that a suspected felon hiding from the police may be flushed out by a biting police dog without offending the Fourth Amendment. As Sgt. Yarnell testified, "[D]aylight has nothing to do with it." Darkness aggravates the problem, but daylight does not dispel it. I believe Chew and Robinette stand on equal footing in this context: it was objectively reasonable in both instances to use police dogs to apprehend them. The minimal factual differences between these cases are insufficient to require different results.
 
 
 314
 What should the police have done to make their conduct reasonable? After Tennessee v. Garner, Chew while running could not be stopped with a bullet. He must be allowed to run. This increases the possibility that he will find a place to hide. Then what? Chew obviously was not going to surrender on his own initiative. His own deposition makes this clear. Nightfall was approaching. It is naive to believe Chew was not buying time until darkness became his ally. Should the police have left their dogs in their kennels and conducted a massive dumpster by dumpster search for Chew before it got dark? Is that the reasonable way to conduct this operation? Were the police required to maintain their perimeter until they starved Chew out? Should the police have given up and gone home? The Fourth Amendment should not require that we send police into the jaws of danger or permit suspected felons to go on their way. Tennessee v. Garner was intended to protect fleeing nondangerous suspects from gunshots, not to allow them to escape or to endanger the suspect's pursuers or the public.
 
 
 315
 In my view, the enforcement challenge presented by Chew and the challenge presented by Ronald Mendoza are constitutionally indistinguishable. See Mendoza v. Block, 27 F.3d 1357 (9th Cir.1994). We held in Mendoza that releasing a police dog to find a hiding felon was objectively reasonable, and we should do so here.
 
 V
 
 316
 It is unfortunate police find it necessary to carry guns and use police dogs. My colleagues are correct: Police dogs can inflict considerable damage on human beings. Nothing I say should be taken for a moment to condone the unprofessional, careless, or inappropriate use of police dogs. A jury in this case returned a verdict for Chew because it believed Officer Bunch went over the line when Chew was finally found. So be it. Police dogs must be well trained, and they must be used appropriately. But in situations like this, the risk of dog bites to menaces like Chew is insignificant in my judgment when compared to the risk posed to police officers forced to go into deathtraps to search for suspected felons. On occasion, officers misuse guns. Sometimes they misuse batons. But I would not therefore render the use per se of guns or batons unreasonable under the Fourth Amendment, only their misuse.
 
 
 317
 Police dogs are capable of feats beyond the capacity of human beings, primarily because of their remarkable senses, including the sense of smell. In one well-known case, a police dog named Pascha ended a one-man crime wave by a career criminal dubbed the "Balcony Burglar," a burglar who had terrorized the Westside of Los Angeles County for many years. Pascha's widely publicized contribution to the safety of the community was heralded in many newspaper articles during January, 1980. The following are excerpts from those articles showing the importance of well trained police dogs to law enforcement and the public.
 
 
 318
 Police this morning cornered and arrested a man they believe is the "Balcony Burglar"--suspected in three murders, 130 burglaries and numerous rapes--following a dramatic pre-dawn manhunt near Century City.
 
 
 319
 The suspect, identified as Harold Holman, 33, of Los Angeles was taken into custody after being sniffed out and attacked by a Santa Monica police dog.
 
 
 320
 Police said Holman was captured about 4:30 a.m., when he was found hiding under a triplex at 2103 Benecia Ave.
 
 
 321
 Following his capture, Holman was taken to Los Angeles New Hospital for treatment of bites on his arms suffered when the dog "chewed him up." He was taken to the West Los Angeles Division police station for questioning following treatment.
 
 
 322
 Holman was booked at the station in connection with a burglary committed less than an hour before his capture.
 
 
 323
 ....
 
 
 324
 The sequence of events leading up to this morning's capture of Holman began when a prowler entered a second-story residence at 2343 Fox Hills Drive about 3:20 a.m. Neighbors summoned police after hearing the woman resident screaming for help.
 
 
 325
 Officers in one of the patrol cars dispatched spotted a man running across Olympic Boulevard near Benecia about three blocks north from the scene of the break-in. Officers then cordoned off an area bounded by Beverly Glen Boulevard, Fox Hills Drive, Olympic and Benecia and began searching for the suspect.
 
 
 326
 A police helicopter was called in and used its powerful flood lights to illuminate the neighborhood while 15 police officers on the ground combed the neighborhood.
 
 
 327
 As the search perimeter was sealed off, the West Los Angeles officers called for help from Santa Monica, where two dogs were being used as part of a special stakeout team looking for the burglar who this week had murdered two people and looted numerous apartments in Santa Monica in recent weeks.
 
 
 328
 At about 4:15 a.m., West Los Angeles officers received another call, this one from a woman in the search area reporting a prowler climbing her fence and knocking over trash cans.
 
 
 329
 The dogs were brought in, and it was Pascha, a German shepherd handled by officer Barney Melekian, who caught the scent and traced the suspect to a crawlspace under the triplex.
 
 
 330
 The animal held Holman at bay, growling and biting the suspect several times on the hands and arms before officers took the man into custody.
 
 
 331
 SMPD Dog Traps Man in WLA Chase, Santa Monica Outlook, Jan. 18, 1980, at A-1, A-8.
 
 
 332
 A grateful public also has been sending its own rewards to Pascha this week. At latest count, seven boxes of dog biscuits have arrived at Santa Monica police headquarters.
 
 
 333
 Melekian took all the congratulations in stride, stressing that it was actually the teamwork among the departments that led to the suspect's capture.
 
 
 334
 If West L.A. (police) hadn't quickly sealed off the neighborhood where the suspect was spotted, "we never would have found him," said Melekian.
 
 
 335
 That comment brought this response from a West L.A. officer: "Without that dog, we probably never would have found him. If we had, it probably wouldn't have been for several more hours and maybe only after a shooting."
 
 
 336
 ....
 
 
 337
 "So we go over there and the dog 'keys' right away. He follows a scent for about 300 yards, over fences, through yards and alleys. He lost it for awhile out on Beverly Glen, then he picked it up again and took us back through a yard (2103 Benecia Ave.) and to this crawlspace opening. Then he just went bananas."
 
 
 338
 "I called for other officers to surround the house, then we yelled a warning under the house that we're sending the dog in. We didn't get an answer so we pushed in the screen and the dog went under and I went after him."
 
 
 339
 Melekian said Pascha found the suspect about 20 feet from the opening. "The guy tried to kick at the dog, and a fight sorta ensued. He was trying to choke the dog, which may be why he got some sore fingers."
 
 
 340
 ....
 
 
 341
 Lt. Glen Ackerman of the West L.A. detective bureau said five or six officers nightly had been working stakeouts during their off-duty hours for about six weeks prior to the arrest.
 
 
 342
 That meant cruising streets from 1 a.m. to 6 a.m., after already putting in a full day of work.
 
 
 343
 "We had a lot of tired detectives when this was over." Ackerman said. "The morning of the capture was an event of great jubilation over the apparent end of this crime pattern."
 
 
 344
 ....
 
 
 345
 "This was a case where the dog really proved his worth." Oswald added as he scratched the docile Pascha behind the ears.
 
 
 346
 Pascha "doesn't know this guy was so important." Melekian said, with Pascha lying at his feet like a 105-pound puppy. "He was just doing his job, like with the other 70 or 80 guys he's gone after."
 
 
 347
 ....
 
 
 348
 Being a hero is nothing new for Pascha. He received the Police Department's Merit of Valor in 1978 for his efforts to control a robbery suspect who had attacked an officer.
 
 
 349
 Mike Tipping, A Party for Pascha, Santa Monica Outlook, Jan. 26-27, 1980, at A-1, A-4.
 
 
 350
 It was a classic police operation in almost every respect. The LAPD helicopter kept the man pinned down while the patrol cars on the perimeter prevented his escape. All that remained was for Pasha [sic] to come in from Santa Monica to track the man down.
 
 
 351
 As it turned out, the suspect had run under my bedroom window to a building two houses down, pulled open the screen cover leading to a crawl space under the house, replaced the screen, and inched his way about 30 feet under the house.
 
 
 352
 It's possible that if Pasha hadn't picked up the scent, somebody might have found him but just about everybody involved said the odds were greater that they wouldn't have found him. Even if they had, considering that he was armed with a .38 pistol, it most likely would have turned out to be a major SWAT operation.
 
 
 353
 ....
 
 
 354
 Since he started his career as a police dog, Pasha has assisted in more than 300 felony arrests. He's found about 50 crime suspects who were doing their best not to be found, and he's only bitten 19 of them
 
 
 355
 That's mainly because Melekian does his best to discourage him from chewing up criminals. Actually, there's no malice in Pasha. Melekian explains. Biting people is sort of a game, like catching a Frisbee is for other dogs.
 
 
 356
 The rules of the game, basically are, that Pasha can't bite anybody unless Melekian orders him to or they try to attack Melekian or another officer, or--and this is the key rule--they try to move after Pasha has sniffed them out.
 
 
 357
 If a burglar, for example, is discovered by Pasha hiding in a building, the dog most likely will simply bark and stand guard, perhaps placing his mouth ever so gently on the suspect's arm. If the suspect stands perfectly still, there's nothing to worry about.
 
 
 358
 But one move and Pasha is free to bite. In training, that's a reward and it works the same way in real situations, although Melekian says Pasha never bites any harder than the "level of resistance" he encounters.
 
 
 359
 "Of the 19 people he's bitten, 12 had guns." Melekian says, "We train the dogs to go for the arm. If somebody tries to kick him, he'll take the leg. But it's a myth that they go for the throat. The most serious injury he's caused was a broken arm."
 
 
 360
 William Overend, Pasha the Wonder Dog, Force's Finest German Shepherd Gets His Man, L.A. Times, Jan. 31, 1980, Sec. 4, at 1, 8-9.
 
 
 361
 As our streets and communities become more dangerous, and as the police come under increasing fire from criminals, it is a tragic mistake for this court to send police dogs to the sidelines in favor of sending in officers to flush out hiding felony suspects like Chew. I repeat Melekian's words: "Of the 19 people [Pasha has] bitten, 12 had guns." The irony in this case is the unstated assumption of the majority that a hiding suspect is in less danger from officers carrying firearms than from a police dog. This assumption may be far from accurate.
 
 
 362
 Without police dogs, the police might still be looking for the Balcony Burglar, Ronald Mendoza, or for that matter, Thane Carl Chew himself. Police dogs by themselves certainly won't solve all our problems, but at least they will protect and help keep alive the officers we pay to catch those dangerous criminals who violate our laws. Such protection is hardly unreasonable. I doubt as Judge Reinhardt claims that using police dogs to flush out hiding felony suspects is the "beginning of the police state and the end of freedom." The decision to establish a K-9 Unit to locate hiding suspected felons should be left to the governmental process. As a matter of policy, the executive and legislative branches of local government can arrive at an informed conclusion, just as they have with the use of guns, tasers, batons, and chokeholds. As in Los Angeles, a police chief, an elected mayor, a police commission, and an elected city council are best positioned to make these decisions and to determine the needs and overall interests of the community.
 
 
 
 [1]
 McKinley was also named in the second claim as a policymaker
 
 
 [2]
 Neither party below wished to challenge the judgment against Bunch on the merits. The question of the preclusive effect of an unchallenged judgment may be raised initially when an appellant attempts to pursue a claim that his adversary believes to be barred. Accordingly, the appellee may raise the issue for the first time by asserting a collateral estoppel or other preclusion argument in his appellate brief
 
 
 [3]
 The district court denied summary judgment against Bunch because of allegations of unreasonable conduct that applied solely to Bunch, namely, that Bunch ordered Volker to attack Chew after he attempted to surrender, and wrongfully kicked Chew in the head and body. Under the jury instructions, the jurors could have based their decision on the theory that the use of Volker was unreasonable in itself. Because summary judgment was denied, Chew was free, absent a contrary order by the court, to introduce evidence to support any theory comprehended by his complaint
 
 
 [4]
 The district court was obviously referring only to the release of Volker and not to Bunch's alleged order to attack Chew after he attempted to surrender. The latter act, if it occurred, would in any event have been contrary to city policy
 
 
 [5]
 Other courts have supplemented these factors with such matters as whether a warrant was used, whether the plaintiff resisted or was armed, whether more than one arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and the nature of the arrest charges. See Hunter v. District of Columbia, 943 F.2d 69, 77 (D.C.Cir.1991). Their determination that the three factors articulated in Graham do not constitute the exhaustive criteria for determining excessive force is undoubtedly correct. In some cases, for example, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. These factors will all be appropriate for the district court to take into account on remand
 
 
 [6]
 There are two ways to interpret the district court's silence on the question of the amount of force used. The district court might have found it unnecessary to analyze the degree of force used because it viewed canine force as slight and hence of little consequence, or because it found that the amount of force used was self-evidently justified on the record before it. Neither conclusion, however, is supportable. Moreover, the better practice is to explicitly state on the record the court's assessment of the quantum of force used to effect an arrest
 
 
 [7]
 Given the violent nature of Volker's attack on Chew, and considering the fact that Volker was still engaged in biting him when the officers came upon the scene, it is not surprising that Chew was responding by hitting the dog with a metal pipe. (There is of course no indication that Chew was armed with that instrument when he fled his car. Rather, it appears that the pipe was in the scrapyard, readily available to Chew as a defensive weapon at the time Volker assaulted him)
 
 
 [8]
 This conclusion is buttressed by Sergeant Mooring's deposition testimony that there are "many, many cases" in which the dogs would be out of sight of their handlers, and that ordering the handlers to maintain constant surveillance over their animals simply would not be feasible
 
 
 [9]
 While defense counsel contended at oral argument that the warrants were issued in connection with burglaries, this information was not part of the record before the district judge, and certainly was not known to Officer Bunch. Moreover, inclusion of this information in the record would make no appreciable difference to the analysis set forth in the text. In Garner, the Court noted that the fact that "an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous." Id. at 21, 105 S.Ct. at 1706. The Court also took notice of statistics showing that burglaries only rarely involve physical violence, and of the FBI's classification of burglary as a "property" rather than a "violent" crime. Id. Here, there is not even an indication that the burglaries for which Chew was wanted occurred at night. See Cal.Penal Code Sec. 460 (1988 ed.)
 
 
 [10]
 Reed involved an angry confrontation between Deputy Hoy and Reed after the deputy arrived at Reed's residence to investigate a domestic dispute. Reed threatened Hoy first with a bamboo stick and then with a splitting maul. Hoy repeatedly warned Reed to put down the splitting maul, and retreated by walking backwards. Reed refused to heed the warnings and continued to advance. Hoy then drew his service revolver, again warned Reed to put down the maul, and shot him in the chest. Reed sued under Sec. 1983, contending that Hoy used excessive force
 The court rejected Hoy's contention that his actions were reasonable as a matter of law, holding instead that on the record before it a rational jury could find for either party. Id. at 330. Certainly Reed presented a greater and more immediate threat than Chew.
 
 
 [11]
 The defendants principally rely on Robinette v. Barnes, 854 F.2d 909 (6th Cir.1988) for the proposition that the use of a police dog to apprehend Chew was reasonable as a matter of law. Robinette was a Sec. 1983 action brought by the estate of a burglary suspect killed by a police dog who found him hiding in a car dealer's showroom, under a car. Robinette does not control the result here. First, Robinette, which predates Graham, appears to have been decided under the assumption that anything short of deadly force may constitutionally be used to apprehend a felon. See id. at 911-13; Jones v. County of DuPage, 700 F.Supp. 965, 971 n. 3 (N.D.Ill.1988). This assumption conflicts with the holding and the reasoning of Graham as well as with prior circuit law. See, e.g., Robins v. Harum, 773 F.2d 1004 (9th Cir.1985). Second, the court in Robinette concluded that the officers on the scene had "probable cause" to believe that the suspect threatened their safety. 854 F.2d at 913. No similar showing of probable cause can be made here. Finally, in concluding that the use of canine force was reasonable, the court was heavily influenced by the fact that the suspect was "hidden inside a darkened building in the middle of the night." 854 F.2d at 913 & n. 5. This case does not involve similar circumstances; it involves a daytime arrest of a suspect who, though hiding, was surrounded and might well have been captured without the infliction of physical injuries
 A recent decision of this court, Mendoza v. Block, 27 F.3d 1357 (9th Cir.1994), upheld a district court's conclusion that the use of a police dog to find, bite, and hold onto a bank robbery suspect was objectively reasonable under all of the circumstances. However, the circumstances in Mendoza were far different from the circumstances present here. In Mendoza the district court found that the officers who released the dog had very strong reasons to believe that the suspect posed an immediate threat to their safety and the safety of others: the suspect was in immediate flight from a bank robbery, and radio broadcasts from police headquarters stated that he was armed. See id., 27 F.3d at 1358. In short, the Mendoza facts appear to meet the standard for the use of deadly force. Chew, by contrast, was not in immediate flight from any crime, and the officers had no reason to believe that he was armed. Moreover, the plaintiff in Mendoza was at large in a residential neighborhood. See id., 27 F.3d at 1358. This location increased the chance that he would escape and be a threat to the public. Finally, it is worth noting that the plaintiff in Mendoza challenged only the individual decision to release the particular police dog used to seize him; unlike Chew, he did not raise a challenge to the municipal policy of training and employing the dogs in general.
 
 
 [12]
 Judge Norris's separate opinion is slightly, if unintentionally, misleading when it states that we must determine in this appeal whether the Los Angeles Police Department's policy is constitutional. See opinion of Judge Norris at 6986. Of course, we need not determine the constitutionality of the Department's policy here; we need only determine whether the district court properly granted summary judgment in favor of the city and its policy makers. Moreover, although Chew will certainly be free to argue on remand that the city policy is unconstitutional on its face, the city would not necessarily escape liability even if it showed that the policy is facially constitutional. To prevail at trial, Chew need not prove the policy unconstitutional. Rather, he need only show that the specific use of force (i.e., Bunch's decision to release Volker) violated the Constitution, and that city policy caused the unconstitutional application of force in this instance
 
 
 [13]
 In their reply to the defendants' answer to the summary judgment motion, defendants stated:
 [Chew] states there is a factual issue as to whether the use of police dogs as of the date of the incident was "policy" or "not policy." Of course if it was not policy, there could be no Monell claim. However for the purpose of this motion it is assumed that it was "policy." [p] He also states that there is a factual issue as to what the policy was.... [H]owever, for the purpose of this motion, it is assumed that the dogs are used to find and seize by biting a concealed suspect who refuses to surrender even if he offers no physical resistance to the dog.
 
 
 [14]
 See "LAPD Begins Warnings on Use of Dogs," Los Angeles Times, September 30, 1992, part B, p. 3, col. 5 (reporting that the department has commenced training its dogs to bark and alert rather than to bite suspects)
 
 
 [15]
 Chew also sues Gates in his official capacity. Official capacity suits generally represent only another way of pleading an action against the entity of which the officer is an agent. Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104-05, 87 L.Ed.2d 114 (1985). Where, as here, the government entity receives notice and an opportunity to respond to the official capacity suit, "[the] suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166, 105 S.Ct. at 3105
 
 
 *
 The term "we" as used in this section refers at all times to the author and Judge Trott. In the preceding sections the occasional use of that term is not intended to imply that any individual judge agrees with a particular proposition
 
 
 [16]
 In attempting to distinguish Robinette, see Opinion of Judge Norris at 1459-1460, Judge Norris ignores one crucial point: the dog in that case was trained and employed in essentially the same fashion as the dogs at issue here, and the Sixth Circuit held that dogs trained in such a manner did not constitute deadly force, even though the dog in Robinette killed the plaintiff's decedent. Our inquiry on the deadly force issue for qualified immunity purposes asks whether a reasonable officer would have known that the use of police dogs in this manner constituted deadly force. Robinette held that a police dog, trained to hold and bite, which killed someone did not constitute deadly force. In light of this decision, it is difficult to understand why a reasonable officer should have known that L.A.P.D. police dogs trained and employed in a similar manner would be held to be deadly force, especially since there is no evidence in the record that any L.A.P.D. dog ever killed anyone
 Judge Norris reads Robinette as being a decision about whether or not a "particular dog" constituted deadly force. See Opinion of Judge Norris at 1459-1460. It should be obvious, however, that the Sixth Circuit would not have issued a published opinion if its decision were so narrowly limited. If we were ordinarily to read cases in the manner in which Judge Norris reads Robinette, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), would stand for the proposition that separate is inherently unequal only in Topeka, Kansas, (or possibly only as to Linda Brown), Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), would stand for the proposition that the courts have the power of judicial review only when considering the validity of a statute conferring mandamus jurisdiction, and our judiciary would be in an even worse state than it already is. Certainly, in the case before us, a police officer in the Sixth Circuit would have been entitled to qualified immunity. Under all of the circumstances, see discussion infra, we believe an officer in the Ninth Circuit was entitled to that protection as well.
 
 
 [17]
 Judge Norris suggests that we miss the point by noting the factual distinctions between this case and Marley. He purports to rely only on Marley's qualified immunity methodology, a methodology he claims is "mandated by our recent decision in Mendoza." Opinion of Judge Norris at 1460. As we explain infra, the methodology employed in Mendoza does not compel a finding of qualified immunity in this case. Although "generic principles of excessive force law," Opinion of Judge Norris at 1460, would lead a reasonable officer to conclude that under some circumstances it would be unlawful to use a police dog, those same generic principles would lead a reasonable officer to believe that under other circumstances it would be lawful to do so. In light of the well established nature of policies like the L.A.P.D.'s, and in light of the cases discussing similar policies, this case falls squarely into the latter category
 
 
 [18]
 Indeed, we see no way of limiting the principle Judge Norris would have us adopt: If Garner means that the law is clearly established in every excessive force case, then Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), must mean that the law is clearly established in every free speech case, and Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), must mean that the law is clearly established in every cruel and unusual punishment case. In short, under Judge Norris's reading of Mendoza, we would always conclude that the law is clearly established, regardless of the nature of the issue. Compare Judge Norris's unlimited reading of Mendoza to his "particular dog" reading of Robinette. See supra note 16
 
 
 [19]
 Our conclusion here is consistent with the analysis in Act Up!/Portland v. Bagley, 988 F.2d 868 (9th Cir.1993), in which we employed "a two-part analysis" to determine whether the defendants were entitled to qualified immunity: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" Id. at 871. In Act Up!, we answered the first question in the affirmative, because "it was clearly established in this circuit that it is unlawful to strip search an arrestee brought to a jail facility on charges of committing a minor offense, unless the officer directing the search possesses a reasonable suspicion that the individual arrestee is carrying or concealing contraband." Id. at 871-72 (footnote and internal quotations omitted). We then said that it was necessary to answer the second question, "whether a reasonable officer could have believed probable cause (or reasonable suspicion) existed to justify a search or arrest." Id. at 873. In this case, however, we conclude that it was not clearly established that the use of dogs to search for, bite, and seize hiding suspects was either deadly force or unreasonable force. Thus we need proceed no further. Frequently, as here, the answer to Act Up! 's first question dictates our decision on qualified immunity, and not only when we decide that the law is not clearly established. In fact, in many cases the answer to the first part of the test will provide the total answer to the qualified immunity question, and a second and separate analysis will be unnecessary
 
 
 [20]
 In light of Mendoza's reliance on the district court opinion below, we simply cannot comprehend Judge Norris's insistence on arguing that the case is controlling authority for his contention that the officers are not entitled to qualified immunity as a matter of law
 
 
 [1]
 I use the term "canine policy" to include both the LAPD policy regarding the dogs' training as well as its policy governing the officers' use of the dogs
 
 
 [2]
 See Defendants' Motion for Summary Judgment at 1 ("The policy or procedure sued [sic] by the Los Angeles Police Department to employ police dogs to find and to seize felony suspects who refuse to surrender is not in violation of the Fourth Amendment...."); id. at 8, 105 S.Ct. at 1699-1700 ("THE POLICY OR PROCEDURE OF THE LOS ANGELES POLICE DEPARTMENT IN ITS USE OF TRAINED POLICE DOGS IS CONSTITUTIONAL")
 
 
 [3]
 The LAPD canine policy explicitly directs that dogs be trained to "seize by biting a concealed suspect who refuses to surrender even if he offers no physical resistance to the dog." Defendants' Reply at 2. Pursuant to that policy, dogs are trained to keep their bite-hold on a suspect unless and until they are called off by their handlers. See Deposition of Donn Yarnall at 57, 59-61; Deposition of Daniel Bunch at 26-27; Deposition of Patrick McKinley at 44-46
 
 
 [4]
 See Model Penal Code Sec. 3.11(2) (1962) (deadly force is "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm"); see also Mattis v. Schnarr, 547 F.2d 1007, 1009 n. 2 (8th Cir.1976) (en banc) (using Model Penal Code definition of deadly force); Pruitt v. City of Montgomery, 771 F.2d 1475, 1479 n. 10 (11th Cir.1985) (same); Ryder v. City of Topeka, 814 F.2d 1412, 1416 n. 11 (10th Cir.1987) (same); Robinette v. Barnes, 854 F.2d 909, 912 (6th Cir.1988) (same)
 
 
 [5]
 Chew stresses that how a dog is trained and used is critical to the determination whether it constitutes a deadly instrument. In his papers opposing summary judgment, Chew distinguishes between two different ways of training and using police dogs: a "find and bark" policy, where dogs are trained not to attack and bite a stationary, non-resisting suspect, but instead to bark until the dog's handler arrives, and a "find, bite, and hold" policy such as the LAPD's. See Chew Opposition to Defendants' Motion for Summary Judgment at 5-9. In fact, Chew has documented how, throughout the 1980s, the LAPD vacillated between these two different policies. According to Chew, beginning in 1980, the LAPD trained its police dogs to find, bite, and hold suspects even if the suspects were stationary and not resisting the dog. In 1984, this policy was abandoned in favor of a find and bark policy used by many other law enforcement agencies. In 1988, the LAPD returned to its original find, bite, and hold policy. See id. at 5-6. More recently, it has apparently returned to a find and bark policy. See "LAPD Begins Warnings on Use of Dogs," L.A. Times, Sept. 30, 1992, at B3
 
 
 [6]
 See, e.g., United States v. Schoenborn, 4 F.3d 1424, 1433 (7th Cir.1993) (whether an object constitutes a dangerous weapon under 18 U.S.C. Sec. 113 is a question of fact that necessarily depends on the particular facts of each case); Robinette v. Barnes, 854 F.2d 909, 912 (6th Cir.1988) ("[M]any law enforcement tools possess the potential for being deadly force.... [A]s any faithful reader of mystery novels can attest, an instrument of death need not be something as obviously lethal as a gun or knife. The ubiquitous 'blunt object' kills just as effectively."); United States v. Moore, 846 F.2d 1163, 1166 (8th Cir.1988) ("The question of what constitutes a 'deadly and dangerous weapon' [under 18 U.S.C. Sec. 111] is a question of fact for the jury.")
 State cases are in accord. See, e.g., People v. Fuqua, 58 Cal. 245, 247 (1881) ("There may ... be cases in which [a weapon's] character ... depends upon the manner in which it was used, and thus becomes a mixed question of law and fact. In cases of the latter kind the character of the weapon must be left to the determination of the jury, under appropriate instructions."); People v. White, 212 Cal.App.2d 464, 465, 28 Cal.Rptr. 67 (1963) (holding that whether any particular instrument constitutes a deadly weapon is "at most a mixed question of law and fact to be determined by the jury upon proper instructions"); People v. Tophia, 167 Cal.App.2d 39, 47, 334 P.2d 133 (1959); People v. Russell, 59 Cal.App.2d 660, 665, 139 P.2d 661 (1943) ("[I]n determining whether an instrument, not inherently deadly or dangerous, assumes these characteristics, recourse may be had to the nature of the weapon, the manner of its use, the location on the body of the injuries inflicted and the extent of such injuries."); People v. Simpson, 134 Cal.App. 646, 651, 25 P.2d 1008 (1933).
 
 
 [7]
 For example, in Marley v. City of Allentown, 774 F.Supp. 343 (E.D.Pa.1991), aff'd without opinion, 961 F.2d 1567 (3d Cir.1992), the jury was instructed to decide whether or not the use of a dog that caused serious injuries to a fleeing suspect constituted the use of "deadly" force. Id. at 346. After the jury returned a verdict for the suspect, the city moved for judgment notwithstanding the verdict on the ground that the deadly force instruction should not have been given because the weapon used was merely a dog. The district court denied the motion. See id.; see also State v. Sinks, 168 Wis.2d 245, 483 N.W.2d 286 (Wis.Ct.App.1992); People v. Nealis, 232 Cal.App.3d Supp. 1, 283 Cal.Rptr. 376 (1991); State v. Bowers, 239 Kan. 417, 721 P.2d 268 (1986); People v. Kay, 121 Mich.App. 438, 328 N.W.2d 424 (1982); Michael v. State, 160 Ga.App. 48, 286 S.E.2d 314 (1981)
 In Nealis, 232 Cal.App.3d Supp. 1, 283 Cal.Rptr. 376, the California Court of Appeals affirmed a conviction for assault with a deadly weapon that involved the siccing of a Doberman Pinscher. The court explained first that "whether a specific dog in a given case is a 'deadly weapon or instrument' is ultimately a question of fact for the jury." Id. at 4, 283 Cal.Rptr. 376. After emphasizing that the conclusion "will depend upon the circumstances of each case," the court reasoned that there was sufficient evidence regarding the viciousness of the dog to support defendant's conviction for assault with a deadly weapon. Id. at 6, 283 Cal.Rptr. 376.
 
 
 [8]
 In addition, Chew points to deposition testimony of Sergeant Mooring who estimated that suspects suffer bite injuries in over 40 percent of the cases in which police dogs are deployed. Deposition of Mark Mooring at 72-75
 
 
 [9]
 Even if it is determined on remand that the use of LAPD dogs such as Volker does not constitute the use of deadly force, I agree with Judge Reinhardt that defendants would still not necessarily be entitled to prevail in this action. The objective reasonableness of the City's canine policy--as written and as applied to the particular facts of this case--would still turn on a genuine issue of material fact. See Opinion of Judge Reinhardt at 1443-44
 
 
 [10]
 "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Garner, 471 U.S. at 11-12, 105 S.Ct. at 1701-02
 
 
 [11]
 Just as defendants stood mute in their summary judgment papers on the specific issue whether LAPD dogs such as Volker constitute instruments of deadly force, they stood mute on the issue whether Chew posed a threat to others
 
 
 [12]
 On this issue, Judge Trott engages in appellate factfinding in saying that Chew posed a significant threat of serious bodily harm to others. See Opinion of Judge Trott at 1464-66. Apparently, Judge Trott believes that police have probable cause to believe that anyone with an outstanding felony arrest warrant who flees by jumping fences and by hiding in places such as scrapyards poses such a threat. See id. at 1465, 1470. In support of his factfinding, Judge Trott approvingly quotes the testimony of Sergeant Yarnall, who stated: "You cannot assume that the man is not armed. You will die." Id. at 1464 (citing Deposition of Yarnall at 102). Yarnall's testimony is consistent with the LAPD canine policy which specifically instructs officers to assume that all felony suspects are armed. See LAPD Canine Manual at 41
 However, the position of Sergeant Yarnall, the LAPD Canine Manual, and Judge Trott is inconsistent with Garner, which holds that police cannot automatically assume that all fleeing felony suspects pose a significant threat of serious physical harm to others. See Garner, 471 U.S. at 21, 105 S.Ct. at 1706 (holding unconstitutional the use of deadly force against a felony suspect not known to be armed who fled the scene of a burglary by scaling a fence). Whether Judge Trott personally believes this Supreme Court law is unsympathetic to the realities of modern law enforcement is irrelevant to our disposition of this appeal.
 
 
 [13]
 On this point, Judge Trott's reasoning suffers a breakdown in logic. He fallaciously assumes that just because the use of police dogs is not always unreasonable, the use of police dogs is always reasonable. Opinion of Judge Trott at 1472
 
 
 [14]
 I also agree with Judge Reinhardt that the verdict against Officer Bunch does not moot or preclude Chew's claims against the remaining defendants. See Opinion of Judge Reinhardt at 1437, 1438-39
 
 
 [15]
 On remand, it is inevitable that the City will repudiate the stipulation it made for summary judgment purposes that Officer Bunch released Volker pursuant to LAPD policy. They have already tried to do so on appeal. The City's strategy makes the deadly force issue critically important to the proper resolution of Chew's claims. Under the Garner deadly force analysis, if the LAPD dogs are found to be instruments of deadly force, then the policy itself, insofar as it authorized the use of deadly force against non-dangerous felony suspects, would be unconstitutional. In that event, Officer Bunch's conduct would have been authorized by an unconstitutional canine policy
 
 
 [16]
 Although Judge Reinhardt and Judge Trott constitute a majority on the qualified immunity issue, I refer to the majority opinion as the "Opinion of Judge Reinhardt" for clarity
 
 
 [17]
 It is important to realize that as policymakers, the defendants must be held to a stricter standard of accountability than officers forced to make snap judgments in the heat of battle on today's dangerous streets. We are not addressing here the qualified immunity of a handler who in a split-second decision releases his dog against a suspect who shows a glint of metal in his hand. Instead, we are addressing the qualified immunity of high-level city officials entrusted with the weighty responsibility to study, analyze, draft, and implement an effective police policy that does not violate the Constitution
 
 
 [18]
 "Although we cannot ignore the fact that, in this case, the use of a police dog did result in a person's death, we also cannot ignore the evidence in the record which indicates that this tragic event was an extreme aberration from the outcome intended or expected." Id
 
 
 [19]
 Compare Opinion of Judge Reinhardt at 1448-49 ("Here, we must determine whether it was clearly established that it was unlawful to use police dogs to search for and apprehend concealed suspects by biting and seizing them.") (emphasis added) with Mendoza, 27 F.3d 1357, 1361-62 ("It is clearly established that '[t]he use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right....' This analysis applies to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or use of a dog. We do not believe that a more particularized expression of the law is necessary....") (citation omitted) and Marley, 774 F.Supp. at 345-46 (the officer "should have been aware of the constitutional constraints enunciated in Garner, and it was not objectively reasonable for him to think that unleashing a trained attack dog" to apprehend this fleeing suspect comported with Garner )
 
 
 [20]
 My colleagues miss the point when they say that Marley could not have guided the Chew defendants in adopting the LAPD canine policy because that case was decided after the incident in this case. I do not cite Marley for that purpose; I cite it for its careful analysis of a similar plea of qualified immunity based on Robinette --first, that Marley considered generic excessive force law from cases such as Garner; second, that Marley recognized that particular dogs could be instrumentalities of deadly force and that that fact question is one for the jury; and third, that Marley discounted the value of the fact-specific case of Robinette in its qualified immunity analysis
 
 
 [1]
 I do concur, however, in the part of Judge Reinhardt's opinion holding that defendants Gates, McKinley, Mooring, and Yarnell are entitled to qualified immunity. Judge Reinhardt's introduction to his opinion correctly characterizes my views
 
 
 [2]
 An "out" is a command to a police dog to cease whatever the dog is doing and return to the handler
 
 
 [3]
 These are the control training exercises:
 
 
 [1]
 Criminal Apprehension (Running)
 The dog shall be placed in a stay facing the decoy. The decoy shall be standing motionless 30 yards away from the dog. Upon direction of the evaluator, the decoy shall break and run away from the dog. The dog shall remain stationary. When the decoy has run 40 yards, the handler shall send his dog. The dog must apprehend the decoy by catching and biting him hard. The dog must bite and hold the decoy until commanded to "out," upon which the dog must immediately release the decoy and return to his handler's heel.
 
 
 [2]
 Criminal Apprehension (Stationary)
 The dog shall be placed in a stay facing the decoy. The decoy shall be standing stationary facing the dog 50 yards away. Upon command, the dog will apprehend the motionless decoy by biting him hard. The dog must bite and hold the decoy until commanded to "out," upon which the dog shall immediately release the decoy and return to his handler's heel.
 
 
 [3]
 False Start
 The dog shall be placed in a stay facing the decoy. The decoy shall be facing the dog and standing motionless at a distance of 30 yards. Upon direction of the evaluator, the decoy shall break and run away from the dog for 30 yards. The dog shall remain stationary during this exercise.
 
 
 [4]
 Call Off (Stationary)
 The dog shall be placed in a stay facing the decoy. The decoy shall be standing motionless facing the dog 50 yards away from the dog. Upon direction of the evaluator, the handler will send his dog to apprehend the decoy. When the dog is within 20 yards of the decoy, the handler shall command his dog to "out." The dog must cease all aggression and return to his handler's heel.
 
 
 [5]
 Call Off (Running)
 The dog shall be placed in a stay facing the decoy. The decoy shall be standing motionless facing the dog at a distance of 30 yards. Upon direction of the evaluator, the decoy shall break and run away from the dog. The dog shall remain stationary. When the decoy has run 40 yards, the handler shall send his dog to apprehend the decoy. When the dog is within 20 yards of the decoy, the handler shall command his dog to "out." The dog must cease all aggression and return to his handler's heel. The decoy must continue running until told to stop by the evaluator.
 
 
 [6]
 Suspect Hold (Stationary)
 The dog shall be placed in a stay facing the decoy. The decoy shall be standing motionless facing the dog at a distance of 30 yards from the dog. Upon command, the dog shall run to the decoy and bark continuously at him. The decoy should remain as still as possible. At this time, the evaluator may direct the decoy to attack the dog, or direct the handler to call his dog to a heel. The handler must remain standing at his original position during the exercise. Any attack by the decoy shall dictate his apprehension by the dog without any influence from the handler. The dog shall bite the decoy hard and hold the bite until commanded to "out." The dog shall then immediately release the decoy and return to his handler's heel.
 
 
 [7]
 Hold (Running)
 The dog shall be placed at a stay facing the decoy. The decoy shall face the dog standing motionless 30 yards from the dog. Upon direction from the evaluator, the decoy shall break and run away from the dog. When the decoy has run approximately 40 yards, the handler shall command his dog to apprehend the decoy. When the dog is within 50 yards, the decoy shall stop, face the dog, and remain motionless. When the decoy stops, the handler shall command his dog to hold the decoy. The dog must stop within six feet of the decoy and bark at him continuously. The evaluator may then order the decoy to run, attack the dog, or direct the handler to call his dog to a heel. The handler must remain standing at his original position during this exercise.
 Id. at 25-26.
 
 
 [4]
 Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir.1994)